UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 24-105** |
| **v.** | * | **SECTION: "D"(1)** |
| **SEAN D. ALFORTISH** | * | |
| **LEON M. PARKER** | * | |
| a/k/a "Chunky" | | |
| | * | |

\* \* \*

**GOVERNMENT'S FILING CONCERNING
SEAN D. ALFORTISH'S AND LEON M. PARKER'S PRE-TRIAL DETENTION**

The United States of America, through the undersigned Assistant United States Attorneys and Department of Justice Trial Attorney, hereby submits this filing in advance of Sean D. Alfortish's and Leon M. Parker's detention hearings. As explained below, this Court cannot rely on Alfortish and Parker to comply with the conditions of any bond, and both defendants pose a serious risk of flight and serious risk to obstruct justice. Because there are no bond conditions that will reasonably assure the defendants' appearances and the safety of others in the community, Alfortish and Parker should be detained.

**FACTUAL BACKGROUND**

*Alfortish*

In December 2024, a federal grand jury in the Eastern District of Louisiana charged Alfortish, Parker, and eight codefendants in a ten-count superseding indictment with various offenses related to the federal investigation into staged automobile collisions, also known as "Operation Sideswipe." Rec. Doc. 78. As stated in the superseding indictment, the staged collision scheme involved individuals who rode in automobiles as passengers knowing they would be part of

1

staged collisions; individuals who drove automobiles and intentionally collided with 18-wheeler tractor-trailers and other commercial vehicles in order to stage collisions, also known as "slammers"; individuals who drove automobiles to search for 18-wheeler tractor-trailers and other commercial vehicles to be part of staged collisions, also known as "spotters"; and law firms, attorneys, and others associated with the law firms and attorneys who pursued fraudulent lawsuits knowing they were based on staged collisions. Rec. Doc. 78, p. 4. One slammer, Cornelius Garrison, covertly cooperated with the federal investigation beginning in or around October 2019 and ending when Garrison was murdered in his mother's New Orleans home in September 2020. *See* Rec. Doc. 78, pp. 6, 21.

     Garrison's cooperation was extensive. Over the course of multiple meetings with agents and prosecutors, Garrison implicated, among others, fellow slammer Ryan Harris; personal injury attorneys Vanessa Motta and Jason Giles; other attorneys practicing in the New Orleans area; and Alfortish, a disbarred attorney who has been in a romantic relationship with Motta. *See* Rec. Doc. 78, p. 5. For example, during a November 2019 meeting with agents, Garrison (described as "CHS" because he was a confidential source at that time) described how he and another slammer (anonymized in the superseding indictment as "Slammer H") staged collisions for Giles and The King Firm. *See* November 19, 2019 FD-1023 Report, attached hereto as Government's Exhibit A.[1] According to Garrison, Giles "wanted [Garrison] to bring [The King Firm] 25 cases per month." Gov. Ex. A, p. 1. Garrison and Slammer H staged so many collisions for The King Firm that they "had to take breaks . . . because The King Firm had to replenish the funds for staging accidents." Gov. Ex. A, p. 1. Garrison "believed every tractor-trailer accident at The King Firm was a staged

---

[1] The government has attached redacted versions of this and other reports to this public filing. Unredacted versions have been provided to defense counsel and the Court.

2

accident" from Garrison and Slammer H. Gov. Ex. A, p. 1.[2]

Eventually, Garrison concluded that he "did not want to deal with middlemen anymore after working with" Slammer H and The King Firm. Gov. Ex. A, p. 2. Around that time, Garrison was introduced to Alfortish, who paid Garrison for staged collisions and "gave" cases based on those collisions to attorneys, including Motta. Gov. Ex. A, p. 2. Alfortish could not handle cases based on Garrison's collisions himself because he had been disbarred following his 2011 federal conviction related to election rigging and embezzlement. *See* David Hammer, *Former horseman's association director pleads guilty to conspiracy*, The Times-Picayune, Sept. 1, 2011.[3] Alfortish had pleaded guilty in that case only a week before his trial was scheduled to begin. *See id.* Before his sentencing, Alfortish circulated a letter stating that he "was 'not guilty of the many things which were said about me'" and that "he took a plea deal with the government because it was in the best interest of his daughter." *See* Gordon Russell, *Former horsemen's association director sentenced to almost four years in prison*, The Times-Picayune, Feb. 3, 2012.[4] Only after being pressed by Judge Fallon and offered to withdraw his guilty plea did Alfortish confirm that he was guilty. *See id.* According to United States Probation, Alfortish's supervised release ended on December 5, 2016, around the time he began working with Garrison.

During a December 13, 2019, meeting with agents and prosecutors, Garrison elaborated on Alfortish's role in the staged collision scheme. *See* December 13, 2019, FD-1023 Report, attached hereto as Government's Exhibit B. For example, Alfortish told Garrison that "staging an accident

---

[2] Slammers Damian Labeaud and Roderick Hickman also staged collisions and brought them to Giles and The King Firm in exchange for payment.

[3] Available at https://www.nola.com/news/crime_police/former-horsemans-association-director-pleads-guilty-to-conspiracy/article_f951d89c-aa6a-5732-947e-921be2a009ef.html.

[4] Available at https://www.nola.com/news/crime_police/former-horsemens-association-director-sentenced-to-almost-four-years-in-prison/article_0593a885-2c94-5f37-a45f-d93ebfdcee64.html.

with four passengers raised red flags," and Alfortish "preferred local police to respond to an accident rather than state police." Gov. Ex. B, p. 2. Additionally, Alfortish "found most of the staged accident participants" and would tell Garrison "to meet the participants under the Claiborne bridge." Gov. Ex. B, p. 2. According to Garrison, Alfortish "used coded language to discuss the staged accident participants, saying he had a certain number of 'horses' for [Garrison] and would provide [Garrison] with the phone number for one of them." Gov. Ex. B, p. 2. Further, Garrison stated that he knew Harris, and that he had provided Harris with Alfortish's phone number. Gov. Ex. B, p. 3.

Garrison also implicated Motta as a knowing participant in the staged collision scheme, stating on December 20, 2019, that Motta "did know accidents were staged from the start," *see* December 20, 2019 FD-1023 Report, attached hereto as Government's Exhibit C, p. 2; and, on January 24, 2020, that he "believed Motta knew accidents were staged because there were so many." *See* January 24, 2020, FBI 302, attached hereto as Government's Exhibit D, p. 2.[5] That same month, Garrison stated that Motta "was impressed with what [Garrison] was able to do in the staged accidents and said she could hook [Garrison] up with people in Los Angeles to do stunt driving." *See* January 9, 2020, FD-1023 Report, attached hereto as Government's Exhibit F, p. 2.

As the Sideswipe investigation continued, Alfortish and Motta sought to make Garrison an unavailable witness. For example, Alfortish "offered to compensate [Garrison] if [Garrison] took the fall for the staged accidents. Alfortish offered $500,000 with $100,000 up front." *Id.* at p. 1. Additionally, Alfortish "offered to move [Garrison] to the Bahamas because of the heat from the investigation into the staged accidents." *Id.* In January 2020, after Garrison received a subpoena for

---

[5] When he first began meeting with the government in October 2019, Garrison stated that Motta "did not know the accidents were staged." *See* October 30, 2019 FBI 302, attached hereto as Government's Exhibit E, p. 2. However, as described above, after his initial meeting, Garrison began implicating Motta in the staged collision scheme.

4

a deposition in one of Motta's cases, Alfortish and Motta arranged for Garrison to be represented by a different attorney as part of a scheme to prevent Garrison from being deposed. While riding in an elevator to the attorney's office, Motta explained to Garrison that he would get along with the attorney because the attorney knew about the "construction"—a reference to the cover story Alfortish had instructed Garrison to use if anyone asked him why he had received so much money from Alfortish and Motta. *See* September 2, 2020 FBI 302, attached hereto as Government's Exhibit G, p. 2 ("Alfortish told Garrison if anything ever happened, Garrison would say the payments from Alfortish were for construction work. Alfortish mentioned this statement to Garrison on multiple occasions.").[6] Motta's unprompted reference to the "construction" cover story is strong evidence of her and Alfortish's complicity in the staged collision scheme.

Following the meeting at the attorney's office, Alfortish and Motta learned that Garrison was represented by a criminal defense attorney, Chief Federal Public Defender Claude Kelly. *See* February 3, 2020, FD-1023 Report, attached hereto as Government's Exhibit H (stating that Alfortish called Garrison and told him that he "read the letter of representation from [Garrison's] attorney and asked if [Garrison] was represented by [Garrison's] attorney"). Upon learning that Alfortish knew about his criminal defense attorney, Garrison told agents that he felt he had been "placed in a position where other[s] will learn of [Garrison's] cooperation" and that he was "not sure who to trust." *See* February 3, 2020, FD-1023 Report, attached hereto as Government's Exhibit I. Garrison also believed Alfortish "was telling people [Garrison] was cooperating." *See* February 4, 2020, FD-1023 Report, attached hereto as Government's Exhibit J. Despite their knowledge that Garrison was represented by a criminal defense attorney, Alfortish and Motta continued to contact Garrison directly, and Motta met with the criminal defense attorney. *See* February 10, 2020, FD-

---

[6] Motta's statement to Garrison about "the construction" was video recorded. The government intends to play excerpts of this and other recordings at Alfortish's detention hearing.

5

1023 Report, attached hereto as Government's Exhibit K. Motta also coached Garrison about how to behave during the deposition, telling him "not to worry," *see* February 16, 2020, FD-1023 Report, attached hereto as Government's Exhibit L; and "to think about what he said before he said it." *See* February 18, 2020, FD-1023 Report, attached hereto as Government's Exhibit M. Motta reassured Garrison that after the deposition the insurance defense lawyers would "stop harassing" him. Gov. Ex. M. Garrison believed that Alfortish "was up to something regarding the deposition." Gov. Ex. L.

At the deposition, Garrison was accompanied by his criminal defense attorney, and he invoked the Fifth Amendment in response to questions. Garrison recounted that Motta "would not look at [him] during the deposition." *See* February 21, 2020, FD-1023 Report, attached hereto as Government's Exhibit N. After the deposition, Motta again attempted to meet with Garrison's criminal defense attorney, and Alfortish called Garrison to tell him that "things did not go well." Gov. Ex. N.

In September 2020, a federal grand jury in the Eastern District of Louisiana charged Garrison and eight codefendants in a seven-count indictment related to staged collisions. *See United States v. Garrison*, E.D. La. No. 20-92, Doc. 1. The indictment made references to "Co-Conspirator A" (Alfortish) and "Attorney B" (Motta), stating that "Co-Conspirator A solicited and/or referred personal injury clients to Attorney B." *Id.* at p. 2. Certain information in the indictment clearly came from Garrison, including that "Co-Conspirator A instructed Garrison on the number of passengers to include in staged collisions" and "Co-Conspirator A instructed Garrison to lie about payments he received from Co-Conspirator A if ever asked." *See id.* at p. 7.

Four days after the indictment, Garrison was murdered at his mother's New Orleans home. Harris's romantic partner, Jovanna Gardner, has pleaded guilty to her conduct the night Garrison

was murdered. *See* Rec. Doc. 49. According to Gardner's factual basis, Harris told her that Garrison was cooperating with the federal criminal investigation into the staged collision scheme. Rec. Doc. 49, p. 2. Harris said that "the lawyers" wanted Harris to pay Garrison so Garrison would not cooperate with federal investigators. Rec. Doc. 49, p. 2. Gardner understood "the lawyers" to mean Motta and Alfortish (referred to in the factual basis as "Attorney A" and "Co-Conspirator B"). Harris instructed Gardner to use a false name when text messaging Garrison as part of a scheme to ensure that Garrison would be in his mother's house at a particular time. *See* Rec. Doc. 49, p. 2. Harris told Gardner it was necessary to use the false name because Garrison may not have agreed to meet otherwise. Rec. Doc. 49, p. 2. Later that night, a "burner" phone that had been purchased by Harris was in the vicinity of Garrison's mother's home at the time of the murder.



*Parker*

As referenced in the superseding indictment, Parker was an associate of Harris's family—specifically, Parker had a romantic relationship with Harris's mother, and he considered himself a stepfather to Harris and Harris's brother. *See* Rec. Doc. 78, p. 2. In January 2016—before Garrison moved from Giles and The King Firm to Alfortish and Motta—Parker had phone calls with

Garrison (whose last four digits of his phone number were 2011). The following are Parker's tolls showing contact with Garrison's phone:



Harris's mother likewise had a call with Garrison:

8

| 03:26 pm | ■■■■■■ | NEWORLEANS,LA | NW/AU | 01:00 |
| 03:27 pm | ■■■■■■ | NEWORLEANS,LA | NW/AU | 01:00 |
| 03:29 pm | ■■■■■■ | Incoming | NW/AU | 01:00 |
| 03:34 pm | ■■■■■■ | Incoming | NW/AU | 01:00 |
| 03:50 pm | ■■■-2011 | Incoming | NW/AU | 02:00 |
| 04:00 pm | ■■■■■■ | Incoming | NW/AU | 01:00 |
| 04:02 pm | ■■■■■■ | NEWORLEANS,LA | NW/AU | 02:00 |
| 04:26 pm | ■■■■■■ | Incoming | NW/AU | 02:00 |

The same day as the calls, Parker, Harris's mother, and Harris's brother were in a collision with an 18-wheeler tractor-trailer that was staged by Garrison. Parker was represented in the fraudulent lawsuit based on the staged collision by Giles and The King Firm. *See* Letter from Jason Giles, attached hereto as Government's Exhibit P.

In January 2017, Parker was in a second staged collision, this time involving Harris's romantic partner Gardner. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

In December 2021, Parker was in a third staged collision. During the fraudulent lawsuit that resulted from the staged collision, Parker was represented by Motta, as can be seen in the signature block for this petition for damages:



In November 2024, Parker was in a fourth collision. Considering Parker's history of

9

involvement in staged collisions, as well as other details, such as the fact that Parker was driving a salvaged vehicle, the government suspects that this collision was also staged.

Parker's criminal history includes charges for first degree murder and burglary that were refused in October 2010. Additionally, two weeks ago on November 26, 2024, Parker was arrested by the Jefferson Parish Sheriff's Office on charges related to possession with intent to distribute marijuana. Prior to the arrest, law enforcement observed Parker leaving his home to sell marijuana and using his electronic devices to arrange sales, including at least one electronic payment with the memo "weed." When JPSO arrested Parker in his car, they found 43 bags of suspected marijuana, weighing approximately a half-kilogram, and two cell phones. According to the 24th Judicial District Attorney's Office, these charges are being accepted.

Moreover, evidence points to Parker playing a role in Garrison's murder. On September 6, 2020—just over two weeks before the homicide—Parker's Google data shows that he searched for: "Corlinus Garrett," "CORNELIUS GARRETT," and "Cornelius Garrett." These searches suggest that Parker attempted to find public information about Cornelius Garrison.

Six days before the murder, on September 16th, Harris text messaged Parker a photograph of a 9-millimeter semi-automatic firearm that Harris unsuccessfully attempted to purchase:



Parker responded, "Man that thing nice almost look like mines, how much". Six days later, Garrison was killed by a 9-millimeter firearm.

On September 21, 2020, the day before Garrison's murder, Parker withdrew nearly all his money from his bank account (approximately $47,000), suggesting that he wanted cash in case he needed to flee after the murder. That same day, Parker met with Harris twice in a parking lot near I-10. Between these meetings, Harris traveled to Family Dollar and purchased one of the "burner" phones used during the murder, which Harris delivered to Gardner. After he delivered the phone, Harris text messaged Parker, "be there around 730," to which Parker replied, "Same spot," and Harris responded, "Yeah." Harris and Parker then met at the same location they did earlier in the day, at which time Gardner started contacting Garrison via the burner phone at Harris's direction. In sum, when Harris directed Gardner to start contacting Garrison posing as "Kim," Parker was with Harris.

The day of the murder, Parker's phone traveled from his home in Hollygrove and returned to the vicinity of his meetings with Harris the day before at approximately 7:40 p.m. After the

meeting, cell site location data on Parker's phone shows the phone traveling back to Hollygrove. When it returned to Hollygrove, the phone was then part of a 71-minute call that coincided with the time of Garrison's murder. The government suspects that Parker arranged for the phone to be brought back to his home and to engage in the 71-minute call to fabricate an alibi for himself at the time of the murder. This suspicion is corroborated by the fact that, after the murder, Harris's phone traveled to Hollygrove, suggesting that Harris was dropping Parker off at home. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

After Harris departed Hollygrove the night of the murder, Parker left his home at 11:20 p.m. and traveled to a park located behind a Home Depot and Walmart on Veterans Boulevard in Kenner. Parker remained in the area for approximately ten minutes and then departed, suggesting that Parker met someone else. Alfortish, a Kenner resident, often had meetings at locations along Veterans Boulevard with Garrison.

Seven days after Garrison's murder, Parker made several Google searches for information related specifically to Alfortish. For example, Parker searched for a May 2019 article describing a lawsuit where the plaintiffs were accused of staging the collision, and where the defense attorneys alleged that Alfortish's medical financing company was linked to other staged collisions. *See* Government's Exhibit R. Four minutes later, Parker searched for a February 2012 article about Alfortish's prior federal sentencing. *See* Government's Exhibit S. Then, four minutes after that, Parker searched for a November 2019 WWL-TV article about how Alfortish and Motta "fit into 18-wheeler accidents fraud in New Orleans." *See* Government's Exhibit T. About eleven minutes later,

12

Parker searched for a January 2018 article on Nola.com about Alfortish's lawsuit to own thoroughbreds after his release from prison. *See* Government's Exhibit U.

## **LAW AND ARGUMENT**

Under 18 U.S.C. § 3142(f), if the Court determines that a defendant poses a serious risk of flight, serious risk of obstruction of justice, or risk to the safety of others in the community, the defendant should be detained. Under § 3142(g), factors for the Court to consider include the nature and circumstances of the offense charged, the weight of the evidence, the history and characteristics of the defendant, and the nature and seriousness of danger to any person or the community that would be posed by the defendant's release.

As described above, Alfortish and Parker have been charged with playing substantial roles in the staged collision scheme—more than the passengers who merely rode in vehicles knowing they would be involved in collisions. The evidence against Alfortish and Parker is overwhelming, including Garrison's statements that the government will seek to admit under the forfeiture by wrongdoing exception, as well as financial documents, phone records, and testimony from cooperators. If convicted, both Alfortish and Parker face substantial sentences because of their criminal histories and the seriousness of their conduct. The strength of the evidence and possibility of lengthy prison sentences could very well motivate Alfortish and Parker to threaten the safety of others in the community or otherwise obstruct the proceedings, as they did previously with Garrison.

The § 3142(g) factors aside, this Court cannot rely on Alfortish and Parker to comply with the conditions of any bond. Alfortish was engaged in a months-long scheme to silence Garrison through offers for pay-offs, offering to move Garrison to the Bahamas, and obstructive conduct related to Garrison's subpoena and deposition, culminating in Garrison's murder. There is no reason

for this Court to believe that Alfortish will sit on the sidelines while these proceedings play out instead of meddling, as he and Motta did throughout the time they knew they were being investigated. Alfortish and Motta's meddling continued even after they learned that Garrison was represented by a criminal defense attorney. Based on Alfortish's history of obstructive conduct and witness tampering, this Court cannot assume that Alfortish will exercise the self-control necessary to justify pre-trial release, and it cannot assume that the community will be any safer now that Alfortish has been indicted than it was when he was referenced in Garrison's indictment in September 2020.

As to Parker, he has demonstrated a years-long inability to follow rules. As described above, Parker participated in at least three staged collisions and possibly was involved in a fourth staged collision as recently as last month. He also has been selling marijuana that he keeps in his house, raising the question of where Parker could reasonably stay if he is released. Moreover, evidence suggests that, at a minimum, Parker assisted Harris with planning and carrying out Garrison's murder. For the safety of the community, to ensure their appearances, and to prevent further obstruction of the proceedings, Alfortish and Parker should be detained.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court order Alfortish and Parker detained.

                    Respectfully submitted,
                    MICHAEL M. SIMPSON
                    Attorney for the United States
                    Acting Under the Authority Conferred
                    by 28 U.S.C. § 515

                    */s/ Matthew R. Payne*
                    MATTHEW R. PAYNE
                    BRIAN M. KLEBBA
                    MARY KATHERINE KAUFMAN
                    Assistant United States Attorneys
                    U.S. Attorney's Office (E.D. La.)
                    650 Poydras Street, Suite 1600
                    New Orleans, Louisiana 70130
                    Telephone: (504) 680-3081
                    E-Mail: Matthew.Payne@usdoj.gov

                    */s/ J. Ryan McLaren*
                    J. RYAN McLAREN
                    Trial Attorney, Bank Integrity Unit
                    Money Laundering & Asset Recovery Section
                    U.S. Department of Justice, Criminal Division 1400 New York Avenue, NW
                    Washington, DC 20005
                    Telephone: (202) 305-0155
                    E-Mail: Ryan.McLaren@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice to all counsel of record.

                    */s/ Matthew R. Payne*
                    MATTHEW R. PAYNE
                    Assistant United States Attorney