**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  24-105** |
| **v.** | * | **SECTION:  "D"(1)** |
| **SEAN D. ALFORTISH,** *et al.* | * | |
| | *    *    * | |

**MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO ADMIT**
**STATEMENTS UNDER THE FORFEITURE BY WRONGDOING EXCEPTION**

The United States of America, through the undersigned attorneys, respectfully requests that this Court enter an order admitting statements to law enforcement and others by Cornelius Garrison under the forfeiture by wrongdoing exception to the hearsay rule. Specifically, the government seeks to admit Garrison's statements against defendants Leon M. Parker, Sean D. Alfortish, Vanessa Motta, and Motta Law, LLC. As explained below, although the government does not seek to admit Garrison's statements against defendants Jason F. Giles and The King Firm, LLC, under the forfeiture by wrongdoing exception, it will seek to admit statements Garrison made to coconspirators about Giles and The King Firm in furtherance of the conspiracy. Further, although the government does not seek to admit Garrison's statements under the forfeiture by wrongdoing exception against defendants Carl G. Morgan and Diaminike F. Stalbert, it will seek to admit statements by Garrison that indirectly implicate Morgan and Stalbert in participating in staged collisions. The remaining defendant, Timara N. Lawrence, is not implicated by this motion.

Additionally, as explained below, the government seeks to admit Garrison's statements based on the attached exhibits, rather than testimony from the case agent or other witnesses. In the event the Court requires testimony, the government will make FBI Special Agent Michael

Heimbach available for any evidentiary hearing. In its proposed scheduling order, the government proposed a hearing date of May 6, 2025. Rec. Doc. 225, p. 3.

## FACTS AND PROCEDURAL BACKGROUND

*The Staged Collision Scheme*

The defendants are charged with participating in a years-long scheme to intentionally stage automobile collisions and file fraudulent insurance claims and lawsuits based on the staged collisions. *See* Rec. Doc. 78 (Superseding Indictment). Among the individuals involved in the staged collisions were multiple "slammers" who crashed automobiles into 18-wheeler tractor-trailers and directed passengers in staged collisions to certain attorneys and law firms to file fraudulent lawsuits. Rec. Doc. 78, p. 4. Cornelius Garrison was a slammer who directed passengers to Vanessa Motta, Motta Law, LLC, Jason F. Giles, and The King Firm, LLC. Rec. Doc. 78, p. 6. Garrison was paid to direct passengers to Motta and Motta Law by Sean D. Alfortish, a disbarred attorney who was Motta's fiancée. Rec. Doc. 78, pp. 5-6. A second slammer, Ryan Harris, worked with Garrison and also directed passengers in staged collisions to Alfortish, Motta, and Motta Law. *See* Rec. Doc. 184 (Harris's Factual Basis).

Collisions that were staged by Garrison include:

- An October 2015 collision involving a Hotard bus and a Dodge Avenger, after which passengers were directed to Alfortish, Motta, and Motta Law for representation in a fraudulent lawsuit;

- A January 2016 collision involving a tractor-trailer and a Dodge Charger, after which defendant Leon M. Parker was directed to Giles and The King Firm for representation in a fraudulent lawsuit. Parker knew Harris and Harris's family;

- An April 12, 2017, collision involving a tractor-trailer and a Lincoln Town Car, after which passengers were directed to Alfortish, Motta, and Motta Law for representation in a fraudulent lawsuit. One of the passengers involved in the April 2017 staged collision was defendant Carl G. Morgan;

- An April 24, 2017, collision involving a tractor-trailer and a Nissan Sentra, after which passengers were directed to Alfortish, Motta, and Motta Law for representation in a fraudulent lawsuit; and

- A September 2017 collision involving a tractor-trailer and a Toyota RAV4, after which passengers were directed to a different attorney (Attorney E) for representation in a fraudulent lawsuit. One of the passengers in the September 2017 staged collision was defendant Diaminike F. Stalbert.

Rec. Doc. 78, pp. 14-16.

As to the January 2016 collision involving Garrison and Parker, Parker had a romantic relationship with Harris's mother, and he considered himself a stepfather to Harris and Harris's brother. *See* Rec. Doc. 78, p. 2. In January 2016—before Garrison moved from Giles and The King Firm to Alfortish and Motta—Parker had phone calls with Garrison (whose last four digits of his phone number were 2011). The following are Parker's tolls showing contact with Garrison's phone the same day as the January 2016 collision:



Harris's mother likewise had a call with Garrison the same day as the January 2016 collision:

| 03:26 pm | | NEWORLEANS,LA | NW/AU | 01:00 |
| 03:27 pm | | NEWORLEANS,LA | NW/AU | 01:00 |
| 03:29 pm | | Incoming | NW/AU | 01:00 |
| 03:34 pm | | Incoming | NW/AU | 01:00 |
| 03:50 pm | -2011 | Incoming | NW/AU | 02:00 |
| 04:00 pm | | Incoming | NW/AU | 01:00 |
| 04:02 pm | | NEWORLEANS,LA | NW/AU | 02:00 |
| 04:26 pm | | Incoming | NW/AU | 02:00 |

These calls between Garrison, Parker, and Harris's mother are consistent with calls between slammers and passengers in other staged collisions. Following the January 2016 staged collision, Garrison directed Parker to Giles and The King Firm, who represented him in a subsequent fraudulent lawsuit. *See* Letter from Jason Giles, attached hereto as Government's Exhibit A.[1]

In January 2017, Parker was in a second staged collision, this time involving Harris's romantic partner Jovanna Gardner. In December 2021, Parker was in a third staged collision. During the fraudulent lawsuit that resulted from the third staged collision, Parker was represented by Motta and Motta Law, as can be seen in this signature block for the petition for damages:



*Garrison's Cooperation and Murder*

In October 2019, Garrison began covertly cooperating with the federal investigation into the staged collision scheme. Rec. Doc. 78, p. 17. Garrison's cooperation was extensive. Over the course of multiple meetings with agents and prosecutors, Garrison implicated, among others,

---

[1] The government has attached redacted versions of this and other exhibits to this public filing. Unredacted versions will be provided upon request from the Court.

Alfortish, Motta, Giles, Harris, and Harris's family members. *See* Rec. Doc. 78, p. 5. For example, during a November 2019 meeting with agents, Garrison (described as "CHS" because he was a confidential source at that time) described how he and another slammer (anonymized in the superseding indictment as "Slammer H") staged collisions for Giles and The King Firm. *See* November 19, 2019 FD-1023 Report, attached hereto as Government's Exhibit B. According to Garrison, Giles "wanted [Garrison] to bring [The King Firm] 25 cases per month." Gov. Ex. B, p. 1. Garrison and Slammer H staged so many collisions for The King Firm that they "had to take breaks . . . because The King Firm had to replenish the funds for staging accidents." Gov. Ex. B, p. 1. Garrison "believed every tractor-trailer accident at The King Firm was a staged accident" from Garrison and Slammer H. Gov. Ex. B, p. 1.[2]

Eventually, Garrison concluded that he "did not want to deal with middlemen anymore after working with" Slammer H and The King Firm. Gov. Ex. B, p. 2. Around that time, Garrison was introduced to Alfortish, who paid Garrison for staged collisions and "gave" cases based on those collisions to attorneys, including Motta. Gov. Ex. B, p. 2. Alfortish could not handle cases based on Garrison's collisions himself because he had been disbarred following his 2011 federal conviction related to election rigging and embezzlement. *See* David Hammer, *Former horseman's association director pleads guilty to conspiracy*, The Times-Picayune, Sept. 1, 2011.[3] Alfortish served a prison sentence for that conviction, and his supervised release ended around the time he began working with Garrison.

During a December 13, 2019, meeting with agents and prosecutors, Garrison elaborated on Alfortish's role in the staged collision scheme. *See* December 13, 2019, FD-1023 Report,

---

[2] Slammers Damian Labeaud and Roderick Hickman also staged collisions and brought them to Giles and The King Firm in exchange for payment.

[3] Available at https://www.nola.com/news/crime_police/former-horsemens-association-director-sentenced-to-almost-four-years-in-prison/article_0593a885-2c94-5f37-a45f-d93ebfdcee64.html.

attached hereto as Government's Exhibit C. For example, Alfortish told Garrison that "staging an accident with four passengers raised red flags," and Alfortish "preferred local police to respond to an accident rather than state police." Gov. Ex. C, p. 2. Additionally, Alfortish "found most of the staged accident participants" and would tell Garrison "to meet the participants under the Claiborne bridge." Gov. Ex. C, p. 2. According to Garrison, Alfortish "used coded language to discuss the staged accident participants, saying he had a certain number of 'horses' for [Garrison] and would provide [Garrison] with the phone number for one of them." Gov. Ex. C, p. 2. Further, Garrison stated that he knew Harris, and that he had provided Harris with Alfortish's phone number. Gov. Ex. C, p. 3.

Garrison also implicated Motta as a knowing participant in the staged collision scheme, stating on December 20, 2019, that Motta "did know accidents were staged from the start," *see* December 20, 2019 FD-1023 Report, attached hereto as Government's Exhibit D, p. 2; and, on January 24, 2020, that he "believed Motta knew accidents were staged because there were so many." *See* January 24, 2020, FBI 302, attached hereto as Government's Exhibit E, p. 2.[4] That same month, Garrison stated that Motta "was impressed with what [Garrison] was able to do in the staged accidents and said she could hook [Garrison] up with people in Los Angeles to do stunt driving." *See* January 9, 2020, FD-1023 Report, attached hereto as Government's Exhibit G, p. 2.

As the Sideswipe investigation continued, Alfortish and Motta sought to make Garrison an unavailable witness. For example, Alfortish "offered to compensate [Garrison] if [Garrison] took the fall for the staged accidents. Alfortish offered $500,000 with $100,000 up front." Gov.

---

[4] When he first began meeting with the government in October 2019, Garrison stated that Motta "did not know the accidents were staged." *See* October 30, 2019, FBI 302, attached hereto as Government's Exhibit F, p. 2. However, as described above, after his initial meeting, Garrison began implicating Motta in the staged collision scheme.

Ex. G, p. 1. Additionally, Alfortish "offered to move [Garrison] to the Bahamas because of the heat from the investigation into the staged accidents." Gov. Ex. G, p. 1. In January 2020, after Garrison received a subpoena for a deposition in one of Motta's cases, Alfortish and Motta arranged for Garrison to be represented by a different attorney as part of a scheme to prevent Garrison from being deposed.[5] While riding in an elevator to the attorney's office, Motta explained to Garrison that he would get along with the attorney because the attorney knew about the "construction"—a reference to the cover story Alfortish had instructed Garrison to use if anyone asked him why he had received so much money from Alfortish and Motta. *See* September 2, 2020 FBI 302, attached hereto as Government's Exhibit H, p. 2 ("Alfortish told

---

[5] Prior to the January 2020 meeting, Motta was admonished in at least two cases involving collisions with 18-wheelers for filing frivolous motions to quash, including a motion to quash a subpoena for Garrison's phone records. *See Henderson-Burkhalter v. Nat'l Union Fire Ins. Co.*, E.D. La. No. 18-cv-928, Doc. 101 (Jan. 1, 2019); *Reff v. Werner Enters., Inc.*, E.D. La. No. 18-cv-8350, Doc. 47 (June 17, 2019). In *Henderson-Burkhalter*, Motta, in her capacity as plaintiffs' counsel for the passengers in the collision, filed a motion to quash a subpoena to Sprint for Garrison's cell phone records. *Henderson-Burkhalter*, E.D. La. No. 18-cv-928, Doc. 74. Judge North denied Motta's motion because her clients lacked standing to challenge a subpoena to Garrison, and Garrison had not himself moved to quash the subpoena of his records. *Henderson-Burkhalter*, E.D. La. No. 18-cv-928, Doc. 93. Six days later, Motta filed a second motion to quash Garrison's Sprint records, this time describing herself as "counsel for Garrison." *Henderson-Burkhalter*, E.D. La. No. 18-cv-928, Doc. 95. Judge North denied Motta's second motion as frivolous, finding, "This Court has already stated repeatedly that the requested records in this case are relevant, given the established and undisputed fact (based on the phone records of Plaintiffs themselves) that Garrison—a former client of Ms. Motta's in a similar motor vehicle accident and a relative of Plaintiff, Henderson-Burkhalter—was in cell-phone contact with Henderson-Burkhalter in the days leading up to the subject incident, the date thereof, and in the early morning hours the day after the incident." *Henderson-Burkhalter*, E.D. La. No. 18-cv-928, Doc. 101, p. 3 (quotation marks and ellipsis omitted) (emphasis omitted). Judge North concluded by warning Motta "against the filing of any similar frivolous motions." *Id.*, p. 4.

In *Reff*, after the defendants issued subpoenas to AT&T and Sprint for two of the plaintiffs' phone records, Motta filed a copy-pasted version of the same motion to quash about which she had been admonished by Judge North. *See Reff*, E.D. La. No. 18-cv-8350, Doc. 39. Judge van Meerveld denied Motta's motion as frivolous and imposed sanctions against Motta in the amount of $1,000. *Id.*, pp. 14-15. Motta's failure to prevent discovery by defendants in other cases provides important context as to why she and Alfortish arranged for Garrison to be represented by a different attorney in January 2020 to prevent Garrison from being deposed.

Garrison if anything ever happened, Garrison would say the payments from Alfortish were for construction work. Alfortish mentioned this statement to Garrison on multiple occasions.").[6]

Following the meeting at the attorney's office, Alfortish and Motta learned that Garrison was represented by a criminal defense attorney, Chief Federal Public Defender Claude Kelly. *See* February 3, 2020, FD-1023 Report, attached hereto as Government's Exhibit I (stating that Alfortish called Garrison and told him that he "read the letter of representation from [Garrison's] attorney and asked if [Garrison] was represented by [Garrison's] attorney"). Upon learning that Alfortish knew about his criminal defense attorney, Garrison told agents that he felt he had been "placed in a position where other[s] will learn of [Garrison's] cooperation" and that he was "not sure who to trust." *See* February 3, 2020, FD-1023 Report, attached hereto as Government's Exhibit J. Garrison also believed Alfortish "was telling people [Garrison] was cooperating." *See* February 4, 2020, FD-1023 Report, attached hereto as Government's Exhibit K. Despite their knowledge that Garrison was represented by FPD Kelly, Alfortish and Motta continued to contact Garrison directly, and Motta met with FPD Kelly. *See* February 10, 2020, FD-1023 Report, attached hereto as Government's Exhibit L. Motta also coached Garrison, a represented party, about how to behave during the deposition, telling him "not to worry," *see* February 16, 2020, FD-1023 Report, attached hereto as Government's Exhibit M; and "to think about what he said before he said it." *See* February 18, 2020, FD-1023 Report, attached hereto as Government's Exhibit N. Motta assured Garrison that after the deposition the insurance defense lawyers would "stop harassing" him. Gov. Ex. N. Garrison believed that Alfortish "was up to something regarding the deposition." Gov. Ex. M.

---

[6] Motta's unprompted reference to the "construction" cover story is strong evidence of her and Alfortish's complicity in the staged collision scheme. The statement was video recorded, and the government will provide the recording upon request from the Court.

At the deposition, Garrison was accompanied by FPD Kelly, and he invoked the Fifth Amendment in response to questions. Garrison recounted that Motta "would not look at [him] during the deposition." *See* February 21, 2020, FD-1023 Report, attached hereto as Government's Exhibit O. After the deposition, Motta again attempted to meet with FPD Kelly, and Alfortish called Garrison to tell him that "things did not go well." Gov. Ex. O.

In September 2020, a federal grand jury in the Eastern District of Louisiana charged Garrison and eight codefendants in a seven-count indictment related to staged collisions. *See United States v. Garrison*, E.D. La. No. 20-92, Doc. 1. The indictment made references to "Co-Conspirator A" (Alfortish) and "Attorney B" (Motta), stating that "Co-Conspirator A solicited and/or referred personal injury clients to Attorney B." *Id.* at p. 2. Certain information in the indictment clearly came from Garrison, including that "Co-Conspirator A instructed Garrison on the number of passengers to include in staged collisions" and "Co-Conspirator A instructed Garrison to lie about payments he received from Co-Conspirator A if ever asked." *See id.* at p. 7.

Four days after the indictment, Garrison was murdered at his mother's New Orleans home. Garrison's fellow slammer Harris has pleaded guilty to his conduct the night Garrison was murdered, as has Harris's romantic partner Jovanna Gardner. In the factual basis supporting his guilty plea, Harris admitted that, in 2020, he learned that Garrison was cooperating, as did Alfortish, Motta, and Parker. Rec. Doc. 184, p. 4. Further, Harris admitted that he facilitated a meeting between Alfortish and Parker so Alfortish could pay Parker to murder Garrison. Rec. Doc. 184, pp. 4-5. According to Harris:

> Garrison's cooperation was problematic for Alfortish and Motta because they had paid Garrison for staged collisions. Similarly, Garrison's cooperation was problematic for Harris and Parker because Garrison had assisted them with staging collisions, including Parker's staged collision in January 2016. Alfortish told Harris that he and Motta had offered to pay Garrison to convince

10

Garrison not to cooperate with the investigation. Additionally, Alfortish, Motta, and Parker commented to Harris that Garrison was a "rat" and a "snitch" and that it would be better if Garrison were dead. Alfortish asked Harris if he knew anyone who could assist Alfortish in killing Garrison. Harris arranged for Alfortish to meet Parker. Harris knew that, by arranging the meeting between Alfortish and Parker, he was assisting Alfortish and Parker's scheme to murder Garrison.

The meeting between Alfortish and Parker took place at Harris's automotive repair shop. During the meeting, Alfortish offered to pay Parker to murder Garrison. Following the meeting, Harris met with Parker multiple times and provided Parker with a "burner" phone for Parker to use to commit the murder. Harris also recruited his romantic partner Jovanna Gardner to assist Harris and Parker with tricking Garrison into being at his home at a particular time. However, Harris did not tell Gardner that she would be assisting with a murder. Rather, Gardner believed she was assisting Harris and Parker in a scheme to pay Garrison to convince Garrison not to cooperate with the investigation. Harris knew that, by providing Parker with the "burner" phone and recruiting Gardner to lie to Garrison, he was assisting Alfortish and Parker's scheme to murder Garrison.

On September 22, 2020, Parker murdered Garrison as part of a scheme with Harris and Alfortish to prevent Garrison from further cooperating with the federal government and exposing the scheme to stage collisions. Shortly before the murder, Harris saw Parker in possession of a firearm, mask, and gloves that Harris believed Parker would use to murder Garrison. Thus, it was reasonably foreseeable to Harris that a firearm would be used to murder Garrison. After the murder, Parker told Harris that he murdered Garrison and that Alfortish paid him for the murder.

Rec. Doc. 184, pp. 4-5.

Gardner made similar admissions in the factual basis supporting her guilty plea. *See* Rec. Doc. 49. Gardner was not aware that Harris, Alfortish, and Parker intended to commit violence against Garrison; instead, she believed that Harris planned to visit Garrison on the night of the murder for the purpose of paying Garrison not to cooperate with the federal investigation. Rec. Doc. 49, pp. 2-3. Significant to the instant motion, Harris told Gardner that "the lawyers" (whom

Gardner understood to mean Motta and Alfortish) had instructed Harris to meet with Garrison

and convince Garrison not to cooperate. Rec. Doc. 49, p. 2. According to Gardner:

> In September 2020, a federal grand jury in the Eastern District of
> Louisiana charged Garrison with various counts of fraud related to
> the staged collisions. Around that time, Harris told Gardner that
> Garrison was cooperating with a federal criminal investigation into
> the staged collisions. Harris told Gardner that "the lawyers"
> wanted Harris to pay Garrison so Garrison would not cooperate
> with the federal criminal investigation. Harris told Gardner that
> "the lawyers" had given him Garrison's home address and that he
> needed Gardner to text message Garrison using the cell phone
> Harris gave her. Gardner understood that "the lawyers" were
> Attorney A [Motta] and Co-Conspirator B [Alfortish]. Harris
> instructed Gardner to use a false name when text messaging
> Garrison. Harris also told Gardner that he would be going to visit
> Garrison to offer Garrison money in order to persuade Garrison to
> stop his cooperation with federal agents regarding fraudulently
> staged collisions. Harris told Gardner that it was necessary to use
> the false name because Harris and the lawyers were worried that
> Garrison may not agree to meet otherwise. Gardner believed she
> was setting up a meeting between Harris and Garrison for this
> purpose. Harris did not tell Gardner that he would commit violent
> acts against Garrison.
>
> Gardner followed Harris's instructions and text messaged Garrison
> using the cell phone Harris gave her and a false name. Gardner
> believed she was assisting Harris in convincing Garrison to not
> cooperate with the federal criminal investigation. Later that
> evening, Garrison was murdered at his mother's home. Following
> the murder, Harris visited Gardner and admitted that he had killed
> Garrison. Harris threatened Gardner that, if she told anyone about
> the murder, he would kill her. Over the next several years, Harris
> made similar threats to Gardner that he would kill or harm her if
> she told anyone about Garrison's murder.

Rec. Doc. 49, pp. 2-3.

Harris's and Gardner's statements are corroborated by other evidence, including cell

phone data. As referenced in Harris's and Gardner's factual bases, Garrison was misled the night

of his murder into believing he was meeting a woman named "Kim." In reality, the "Kim" with

whom Garrison had been exchanging text messages was Gardner, who was using a burner phone

provided to her by Harris. Harris also provided a burner phone to Parker, and the two burner phones communicated with each other while Gardner was sending text messages to Garrison as "Kim." Phone records related to the burner phones and these individuals' personal phones confirm Harris, Parker, and Gardner's participation in the scheme to trick Garrison.

In December 2024, after the defendants were charged in this case, the government moved for pretrial detention against Parker and Alfortish. During Parker's detention hearing, FBI Special Agent Michael Heimbach testified about phone records from around the time of Garrison's murder. *See* Testimony of FBI Special Agent Michael Heimbach, attached hereto as Government's Exhibit P.[7] Among other things, Agent Heimbach testified that GPS data showed meetings between Parker and Harris the day before Garrison's murder—consistent with Harris's admission that he met with Parker before the murder and provided both Parker and Gardner with burner phones. *Compare* Gov. Ex. P, pp. 28-29 (AUSA: "Did Mr. Parker meet with Mr. Harris the day before the homicide?" Agent Heimbach: "Yes. . . . I believe the meeting took place roughly in the area of I-10 Service Road and Crowder Boulevard near the Planet Fitness."), *with* Rec. Doc. 184, p. 5 ("Harris met with Parker multiple times and provided Parker with a 'burner' phone for Parker to use to commit the murder. Harris also recruited his romantic partner Jovanna Gardner to assist Harris and Parker with tricking Garrison into being at his home at a particular time.").

Agent Heimbach also described the traffic between the burner phones and Garrison, and he concluded that one of the burner phones was instructing the second burner phone while the second burner phone was communicating with Garrison. Gov. Ex. P, p. 31. This too is consistent with admissions from Harris and Gardner in their factual bases. *See* Rec. Doc. 184, pp. 4-5; Rec.

---

[7] As mentioned on Page 43 of the attached transcript, a portion of Parker's detention hearing was conducted under seal. The government will provide the sealed transcript upon request from the Court.

Doc. 49, pp. 2-3. Moreover, Agent Heimbach testified that, two weeks before Garrison's murder, Parker searched for Garrison's name on Google—something that, because Garrison had not yet been indicted, Parker would have had no reason to do unless he was involved in the staged collision scheme and concerned that Garrison was cooperating against him. *See* Gov. Ex. P, pp. 38-39. Agent Heimbach also testified that, the day before Garrison's murder, Parker emptied his bank accounts with withdrawals of approximately $47,000, Gov. Ex. P, pp. 27-28, a fact that Judge van Meerveld cited when she ruled that Parker should be detained pretrial. *See* Gov. Ex. P, p. 60 (Judge van Meerveld: "I am concerned that one day before the murder, [Parker] withdrew $47,000 which was substantially all of his money from his accounts. This certainly suggests that he was concerned about something.").[8]

Agent Heimbach further testified that, one week after Garrison's murder, Parker searched Google for information about Alfortish, including a November 2019 news article about the investigation into Alfortish and Motta. Gov. Ex. P, pp. 39-43. And, hours after the murder, at approximately 11:20 p.m., Parker traveled from his home in Hollygrove to the rear of a Home Depot in Kenner. Gov. Ex. P, p. 37. As Agent Heimbach testified, Alfortish lived in Kenner, and,

---

[8] Agent Heimbach's testimony and Judge van Meerveld's findings both referenced a 71-minute phone call Parker's phone purportedly made from Parker's home at the time of Garrison's murder, suggesting that Parker was at home when Garrison was killed. *See* Gov. Ex. P, pp. 35-36, 47-48, 61. Agent Heimbach testified, and Judge van Meerveld found, that the call may have been made by someone else to provide Parker with a false alibi. *See* Gov. Ex. P, pp. 35-36, 61. Since Parker's detention hearing, the government has continued to investigate the Sprint phone records for Parker's call history and concluded that it had misinterpreted the times described on specifically Parker's Sprint call records (as opposed to other information, such as Google location data, or call records for phones belonging to others, such as Harris).

The result is that the government now knows that the 71-minute call occurred hours before Garrison's murder, so it cannot provide an alibi for Parker—indeed, Parker's phone had no contacts between approximately 60 minutes before and 90 minutes after Garrison's murder. The government's reevaluation of the Sprint call records has no impact on other evidence demonstrating Parker's involvement in Garrison's murder, including the evidence described in this motion and, notably, Harris's and Gardner's factual bases.

before Garrison was murdered, Alfortish had met with Garrison multiple times at various locations off Veterans Highway. Gov. Ex. P, p. 38. According to Harris's factual basis, "[a]fter the murder, Parker told Harris that he murdered Garrison and that Alfortish paid him for the murder." Rec. Doc. 184, p. 5. This evidence suggests that, after Parker murdered Garrison, he met Alfortish in the Home Depot parking lot so Alfortish could pay him.

## LAW AND ARGUMENT

"'[T]he Sixth Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him.'" *United States v. Hankton*, 51 F.4th 578, 598 (5th Cir. 2022) (quoting *Giles v. California*, 554 U.S. 353, 358 (2008)). "There are, however, exceptions to this rule, including the doctrine of forfeiture by wrongdoing." *Id.* "'[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 833 (2006)). "An out-of-court statement is admissible as evidence if the declarant is unavailable as a witness and '[the] statement [is] offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result.'" *Id.* (quoting Fed. R. Evid. 804(b)(6)).

"Such wrongful conduct includes but it not limited to murdering a witness." *United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) (quotation marks omitted). "Coercion, undue influence, or pressure to silence testimony suffices to establish the requisite wrongdoing." *United States v. Blackshire*, 98 F.4th 1146, 1152 (9th Cir. 2024) (brackets omitted). "[T]he government is not required to show that the defendant's sole motivation was to procure the declarant's

absence; rather, it need only show that the defendant was motivated in part by a desire to silence the witness." *United States v. Age*, No. 16-32, 2022 WL 991759, at *3 (E.D. La. Apr. 1, 2022) (Ashe, J.) (quotation marks omitted) (emphasis omitted). "[A] co-conspirator's waiver of confrontation rights can be imputed to other participants in the conspiracy when the wrongful act at issue was in furtherance and within the scope of an ongoing conspiracy and reasonably foreseeable as a natural or necessary consequence." *Id.* (quotation marks omitted).[9]

"The party invoking the rule carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable." *Id.* (citing *Davis*, 547 U.S. at 833). A district court determining the admissibility of a witness's statements under the forfeiture by wrongdoing exception may consider hearsay evidence introduced through a case agent. *See United States v. Gurrola*, 898 F.3d 524, 535 (5th Cir. 2018) ("The district court was entitled to rely on Agent Salloway's testimony in rendering its pre-trial ruling[.]"); *Age*, 2022 WL 991759, at *4-6 (relying on agent's testimony during pre-trial hearing). If the witness's statements are deemed admissible, Rule 804(b)(6) "places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at

---

[9] *See also United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015) ("The district court should have articulated that the murder . . . was within the scope of and in furtherance of the conspiracy, and that the murder was reasonably foreseeable to the defendants other than Martinez and Avila so that the forfeiture by wrongdoing doctrine applied to all who had acquiesced in wrongfully causing the declarant's unavailability.") (quotation marks omitted); *United States v. Dinkins*, 691 F.3d 358, 386 (4th Cir. 2012) ("[W]e conclude that the district court properly admitted the Dowery hearsay statements against Dinkins under the forfeiture-by-wrongdoing exception to the Confrontation Clause pursuant to *Pinkerton* principles of conspiratorial liability."); *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006) ("[T]he reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable, so long as their misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant[.]"). *But see United States v. Brown*, 973 F.3d 667, 700-01 (7th Cir. 2020) (questioning, without deciding, application of *Pinkerton* liability to forfeiture by wrongdoing analysis); *United States v. Richardson*, No. 19-20076, 2924 WL 961270, at *21-22 (D. Kan. Mar. 6, 2024) (rejecting application of *Pinkerton* liability to forfeiture by wrongdoing analysis because "*Pinkerton* liability was not recognized under common law at the time of the founding") (emphasis omitted).

trial." *See Age*, 2022 WL 991759, at *3. "There is no limitation because by its plain terms, Rule 804(b)(6) refers to the intent of a party to procure the unavailability of the witness, and does not limit the subject matter of the witness' testimony to past events or offenses the witness would have testified about had he been available." *Id.* (quotation marks, brackets, and ellipsis omitted) (emphasis omitted).

In *Hankton*, a witness provided statements to NOPD detectives and testified before an Orleans Parish grand jury that he saw Telly Hankton shoot Jesse Reed "50 times while fleeing a front porch in the Central City neighborhood of New Orleans." *United States v. Hankton*, No. 12-201, 2016 WL 10950447, at *1-2 (E.D. La. June 2, 2016) (Feldman, J.), *aff'd*, 51 F.4th at 597-600. Nine days later after he testified before the grand jury, the witness was murdered. *Id.* at *2. During the subsequent prosecution of Hankton and other defendants for, among other things, RICO conspiracy, the government sought to admit the witness's recorded statements and grand jury testimony. *Id.* To support its motion, the government attached (1) a transcript of the witness's recorded statement to NOPD detectives from the night of the Reed murder, *United States v. Hankton*, E.D. La. No. 12-cr-01, Doc. 1307-2; (2) an identification of Hankton signed by the witness on the night of the Reed murder, *Hankton*, E.D. La. No. 12-cr-01, Doc. 1307-3; (3) the transcript of the witness's grand jury testimony, *Hankton*, E.D. La. No. 12-cr-01, Doc. 1307-4; and (4) ballistics reports showing that the witness was shot by guns that were linked to the Reed murder. *Hankton*, E.D. La. No. 12-cr-01, Docs. 1307-5 & 1307-6. Judge Feldman heard argument on the government's motion, but no witnesses testified, and no additional evidence was offered. *See Hankton*, E.D. La. No. 12-cr-01, Doc. 1480 (Minute Entry for Motion Hearing); *Hankton*, E.D. La. No. 12-cr-01, Doc. 1936, pp. 3-17 (Transcript of Motion Hearing).

In the order admitting the witness's statements and grand jury testimony, Judge Feldman observed that the witness and Hankton "knew each other for years before the Jesse Reed murder" and that the witness "stated to police officers and to the grand jury that he clearly recognized Hankton as the driver and one of the shooters." *Hankton*, 2016 WL 10950447, at *4. Thus, "[i]t is more likely than not that Hankton clearly recognized [the witness], as well." *Id.* Judge Feldman also cited the fact that the witness was murdered only nine days after his grand jury testimony and that the guns used in the two murders were ballistically linked as evidence that "further narrow[ed] the likelihood of coincidence." *Id.* Judge Feldman ruled that the witness's statements were admissible against both the defendant who murdered the witness and Hankton, who was in prison at the time the witness was shot but nevertheless led the criminal enterprise and "acquiesced in wrongfully causing the unavailability of the witness." *Id.* After Hankton was convicted, he appealed Judge Feldman's findings, and the Fifth Circuit affirmed. *Hankton*, 51 F.4th at 597-600.

In *Age*, the witness was a codefendant in a Medicare fraud case that was charged in the Middle District of Louisiana against, among others, Louis Age, Jr. *Age*, 2022 WL 991759, at *1. The witness had filed documents in the Middle District indicating that he was changing his plea to guilty. *Id.* Two days later, the witness was murdered in New Orleans by a hitman paid by Age, Jr. and his family. *See id.* During the subsequent prosecution for the witness's murder in the Eastern District of Louisiana, the government sought to introduce statements the witness "made to other individuals pertaining to his knowledge of the Age family's prior criminal activities and his fear of Age, Jr. and his associates." *Id.* Judge Ashe held an evidentiary hearing, during which the government presented testimony from FBI Special Agent Chuck Williams. *See Age*, E.D. La. No. 16-cr-32, Doc. 807 (Minute Entry for Motion Hearing); *Age*, E.D. La. No. 16-cr-32, Doc.

18

826 (Transcript of Motion Hearing). Among other things, Agent Williams recounted the circumstances of the witness's murder and the FBI's investigation, as well as statements by other witnesses and coconspirators. *See Age*, 2022 WL 991759, at *4-5 (summarizing Agent Williams's testimony). Agent Williams also testified about what the witness had told others before he was murdered, including that he was afraid that Age, Jr. would retaliate against him. *Id.* at *5.

In the order admitting the witness's statements, Judge Ashe found that Agent Williams's testimony "establishe[d] by both a preponderance and clear-and-convincing standard of the evidence (for the purposes of the forfeiture-by-wrongdoing hearing only) that Defendants were involved in, or responsible for, procuring [the witness's] unavailability as an actual or potential witness and that they did so intending that result." *Id.* at *6.[10] Judge Ashe cited the fact that Age, Jr. paid another defendant to murder the witness and that the other members of the conspiracy all knew that the witness was potentially cooperating against them. *Id.* Because the witness's murder was reasonably foreseeable and within the scope of the conspiracy, his statements to, among others, law enforcement and his criminal defense attorney were admissible against all of the defendants. *Id.* Further, because the forfeiture by wrongdoing exception imposes no limits on the subject matter that may be admitted, all of the witness's statements on any topic were admissible, subject to other evidentiary objections such as relevance. *Id.* After Age, Jr. was convicted, he appealed Judge Ashe's findings, and oral argument in the appeal was held in

---

[10] As Judge Ashe recognized, an unpublished Fifth Circuit case previously "commented that the standard of proof 'may well be higher' than preponderance of the evidence when the objection to the admission of an unavailable declarant's statements is rooted in the Confrontation Clause, rather than Rule 804(b)(6)." *Id.* at *3 n.15 (citing *United States v. Nelson*, 242 F. App'x 164, 171 n.2 (5th Cir. 2007)). In the *Hankton* appeal, which was decided after Judge Ashe's order, the Fifth Circuit declined to apply *Nelson* and stated, "[O]ur precedent clearly holds that the burden of proof to introduce evidence under Rule 804(b)(6) is the preponderance standard." *Hankton*, 51 F.4th at 599 & n.10.

October 2024 (although forfeiture by wrongdoing was not among the issues discussed during the argument). *See* Age, Jr. Oral Argument, available at https:// www.ca5.uscourts.gov/OralArg Recordings /22/22-30656_10-7-2024.mp3.

Here, the government seeks to admit Garrison's statements to law enforcement and others, including FBI special agents and Garrison's criminal defense attorney, FPD Kelly. As described above, Garrison's statements primarily implicated Alfortish, Motta, and Motta Law in the staged collision scheme and cover-up. They also showed Garrison's growing concerns that Alfortish had learned that he was cooperating and that he did not know whom he could trust. If Garrison were still living, his testimony would have been central to the case against Alfortish, Motta, and Motta Law. Because those defendants knowingly and with bad intent caused Garrison to be unavailable, his statements should be admissible against them.

A.    **Garrison's statements should be admitted against Parker.**

As described above, the government has developed substantial evidence, including through Harris's cooperation, that Parker was involved in planning and carrying out Garrison's murder. *See* Rec. Doc. 184, pp. 4-5 (Harris's factual basis describing Parker's conduct). Although Garrison does not appear to have mentioned Parker by name during his cooperation, Garrison's statements about Harris and Harris's family indirectly implicated Parker in the staged collision scheme. *See, e.g.*, Gov. Ex. H, p. 2 ("[Garrison] knows the Harris family—there were about 25 to 30 of them. Many of the family participated in staged accidents. CHS facilitated a couple of accidents with the family, but no more. These accidents went to Alfortish."). Because Parker intentionally caused Garrison's unavailability, Garrison's statements should be admissible against him. *See Hankton*, 51 F.4th at 598.

**B.      Garrison's statements should be admitted against Alfortish.**

Similarly, the government has developed substantial evidence, including through Harris's cooperation, that Alfortish arranged for Garrison's murder and caused it to occur. *See* Rec. Doc. 184, pp. 4-5 (Harris's factual basis describing Alfortish's conduct). According to Harris, Alfortish, Motta, and Parker commented that Garrison was a "rat" and a "snitch" and that it would be better if Garrison were dead. Rec. Doc. 184, p. 4. Further, Alfortish asked Harris if he knew anyone who could assist Alfortish in killing Garrison. Rec. Doc. 184, pp. 4-5. After the murder, Parker told Harris that he murdered Garrison and that Alfortish paid him for the murder. Rec. Doc. 184, p. 5. Harris's admissions are corroborated by, among other things, Parker's phone records showing that Parker searched for news stories about Alfortish, Motta, and the staged collision scheme after Garrison was murdered and that, hours after the murder, Parker drove to Kenner for a meeting in the rear of a Home Depot. Gov. Ex. P, pp. 38-43.

Harris's cooperation notwithstanding, Garrison alerted law enforcement to Alfortish and Motta's multiple attempts to silence him, including by offering to pay Garrison and move him to the Bahamas, Gov. Ex. G, p. 1; using a different lawyer to attempt to obstruct Garrison's participation in a deposition; and continuing to contact Garrison despite their knowledge that Garrison was represented by FPD Kelly. *See* Gov. Ex. L; Gov. Ex. M; Gov. Ex. N. Accordingly, Garrison's statements should be admissible against Alfortish.

**C.      Garrison's statements should be admitted against Motta/Motta Law.**

Motta's persistent efforts to prevent Garrison from talking to anyone about the staged collision scheme—including federal criminal investigators and insurance defense attorneys in depositions—demonstrated her bad intent and desire to make Garrison an unavailable witness. According to Gardner, Harris was sent by "the lawyers," including Motta, the night Garrison was

murdered so Harris could bribe Garrison not to cooperate. Rec. Doc. 49, p. 2. According to

Harris, Alfortish was more involved with arranging the murder. *See* Rec. Doc. 184, pp. 4-5. Still,

Motta and Alfortish's romantic relationship and the fact that they worked closely together

throughout the staged collision scheme (despite Alfortish's being disbarred) suggests, at least for

purposes of this pretrial evidentiary matter, that Alfortish's criminal behavior should be imputed

to Motta. *See United States v. Sanders*, 952 F.3d 263, 275 (5th Cir. 2020) (affirming defendant's

convictions for health care fraud and holding, "All of that evidence, combined with [the

defendant's] marriage to Mr. Rose, the ringleader, and her number three position in a company

permeated with fraud, is enough to sustain the conviction."). At a minimum, Motta's history of

obstructive behavior with Garrison and her close relationship to Alfortish establish that she

acquiesced to Garrison's being made unavailable. *See Hankton*, 2016 WL 10950447, at *3

(admitting witness's statements against the defendant despite his being in prison at the time of

the witness's murder and his not being charged with murdering the witness because the

defendant acquiesced in wrongfully causing the unavailability of the witness). Because Motta

Law was the entity through which Motta perpetrated the staged collision scheme, Garrison's

statement should likewise be admitted against Motta Law.

> **D.     The government does not seek to admit Garrison's statements to law enforcement and others against Giles/The King Firm but will instead admit coconspirator statements.**

Garrison provided substantial cooperation against Giles and The King Firm, saying,

among other things, that he "believed every tractor-trailer accident at The King Firm was a

staged accident" from Garrison and Slammer H. Gov. Ex. B, p. 1. If Garrison were still alive, he

would have been an important cooperator against Giles and The King Firm, in addition to

Alfortish, Motta, and Motta Law. However, unlike those defendants, the government does not

have evidence that Giles and The King Firm were involved with making Garrison an unavailable

witness. As described in the indictment, Giles and The King Firm engaged in their own

obstructive behavior with slammers Damian Labeaud and Roderick Hickman, and they

convinced passengers in collisions to sign false "Verification of Facts" documents as part of a

scheme to cover up their involvement in the conspiracy. *See* Rec. Doc. 78, pp. 11-12.

Arguably, their involvement in this obstructive conduct made it reasonably foreseeable to

them that other coconspirators in the staged collision scheme would take similar steps toward

silencing Garrison, who was a slammer for Giles and The King Firm before he moved to

Alfortish, Motta, and Motta Law. *See Age*, 2022 WL 991759, at *3 ("[A] co-conspirator's waiver

of confrontation rights can be imputed to other participants in the conspiracy when the wrongful

act at issue was in furtherance and within the scope of an ongoing conspiracy and reasonably

foreseeable as a natural or necessary consequence.") (quotation marks omitted). However, the

government has not located a case where the forfeiture by wrongdoing exception was applied so

broadly to members of the same conspiracy who participated in obstructive conduct toward

separate witnesses. As a result, this motion does not seek to admit Garrison's statements to law

enforcement and others against Giles and The King Firm under the forfeiture by wrongdoing

exception.

Instead, the government will admit statements Garrison made to Harris during and in

furtherance of the conspiracy, including that certain of his and Garrison's staged collisions were

directed to Giles and The King Firm. *See* Rec. Doc. 184, pp. 1-2. These coconspirator statements

from Garrison to Harris are not hearsay; thus, they will be admissible against Giles and The King

Firm. *See United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007) ("[A] statement is not hearsay

if it is made by a co-conspirator during the course and in furtherance of the conspiracy.")
(quotation marks omitted).

### E.    The government does not seek to admit Garrison's statements to law enforcement and others against Stalbert and Morgan, although Garrison's statements admitted against others will implicate them.

The government likewise does not seek to admit Garrison's statements to law
enforcement and others under the forfeiture by wrongdoing exception against defendants Stalbert
and Morgan. Neither defendant participated in the scheme to make Garrison an unavailable
witness. However, certain of Garrison's statements that are admissible against other defendants
will implicate Stalbert and Morgan in the staged collision scheme. Garrison does not appear to
have named Stalbert or Morgan during his cooperation, but he did provide information about
collisions they were in, including admitting to his participation in a staged collision involving an
18-wheeler and a Toyota RAV4 in which Stalbert was a passenger, *see* Rec. Doc. 78, p. 15
(superseding indictment describing RAV4 collision), and his participation in a collision
involving Harris's "blind brother." *See* Gov. Ex. D, p. 2. Harris does not have a blind brother, but
he does have a blind uncle who was a passenger in the April 12, 2017, staged collision involving
defendant Morgan. *See* Rec. Doc. 78, p. 15.

These statements should be admissible against Parker, Alfortish, Motta, and Motta Law
because they are relevant to establishing the existence of a conspiracy involving two or more
coconspirators. Shortly before his murder, Garrison was indicted with staging the RAV4
collision, and the fact that he admitted to staging it will make his statements on other matters
more credible. Further, the fact that Garrison had a working relationship with Harris and the fact
that Garrison staged several collisions for Harris's family members, including Harris's "blind
brother," will be important in the upcoming trial. Although the government does not intend to

24

use these statements against Stalbert and Morgan, the jury could make the inferential leap that Garrison was referring to the same collisions involving the RAV4 and Harris's "blind brother" and then use those statements against Stalbert and Morgan. The Fifth Circuit has made clear that the solution in these types of situations where evidence is admissible against one defendant but inadmissible against another is to provide limiting instructions to the jury. *See United States v. Rocha*, 916 F.2d 219, 228-29 (5th Cir. 1990). The government raises the issue now to explain its position and prevent surprise.

> **F.    This Court may rule on the admissibility of Garrison's statements without an evidentiary hearing.**

When confronted with the same forfeiture by wrongdoing issue in *Hankton*, Judge Feldman reviewed documentary evidence appended to the government's filing and concluded that the murdered witness's statements should be admitted without an evidentiary hearing. This Court should do the same based on Harris and Gardner's factual bases, Garrison's statements to law enforcement, and Agent Heimbach's testimony at Parker's detention hearing. If the Court requires an evidentiary hearing similar to the one held in *Age*, the government will make Agent Heimbach available to testify. However, the government anticipates that Agent Heimbach's testimony will be largely duplicative of his testimony before Judge van Meerveld. Because the law does not mandate that the Court hold an evidentiary hearing, and because the government has submitted more than sufficient materials to establish by a preponderance of the evidence that certain defendants schemed to make Garrison unavailable, the government requests that the Court grant the instant motion without an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court enter an order admitting statements to law enforcement and others by Cornelius Garrison under the forfeiture by wrongdoing exception to the hearsay rule as described in this motion.

Respectfully submitted,

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
BRIAN M. KLEBBA
MARY KATHERINE KAUFMAN
Assistant United States Attorneys
J. RYAN McLAREN
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
Assistant United States Attorney