UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 24-105 |
| v. | * | SECTION: "D"(1) |
| RYAN HARRIS, *et al.* | * | |
| | * * * | |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION TO
ADMIT STATEMENTS UNDER THE FORFEITURE BY WRONGDOING EXCEPTION**

The United States of America, through the undersigned attorneys, hereby submits this reply in support of its Motion to Admit Statements Under the Forfeiture by Wrongdoing Exception. *See* Rec. Doc. 227. The government files this brief at the Court's request. *See* Rec. Doc. 338.

The government seeks to admit statements made by Cornelius Garrison to law enforcement and others against defendants Sean D. Alfortish, Leon M. Parker, Vanessa Motta, and Motta Law, LLC. The government intends to establish forfeiture by wrongdoing through testimony by FBI Special Agent Michael Heimbach and exhibits attached to its original motion. Application of the forfeiture by wrongdoing exception against each defendant is straightforward:

- Concerned that Garrison was cooperating with the federal investigation into the staged collision scheme, Alfortish asked slammer Ryan Harris if he knew anyone who could assist Alfortish with killing Garrison. On at least one occasion, Alfortish and Harris discussed Garrison's murder at the Motta Law office with Motta present.[1]

---

[1] [redacted]

- Harris arranged for Alfortish to meet Parker at Harris's automotive repair shop. During the meeting, Alfortish offered to pay Parker to murder Garrison, which Parker did. After the murder, Parker told Harris that he murdered Garrison and that Alfortish paid him for the murder.

- At a minimum, Motta (and Motta Law through Motta) was aware that Garrison would be murdered and did nothing to stop it. Based on Motta's close personal and professional relationship with Alfortish, it is also reasonable to infer that she played a role in planning the murder, although it is not necessary for the Court to reach that conclusion. Motta's acquiescence to silencing Garrison through murder is consistent with her persistent efforts to block others from investigating Garrison's role in the staged collision scheme.

The opposition motions filed by Jason F. Giles and The King Firm, Rec. Doc. 240; Carl G. Morgan, Rec. Doc. 292; Parker, Rec. Doc. 340; and Motta and Motta Law, Rec. Doc. 262; misunderstand the government's descriptions of the testimony that will be provided at the evidentiary hearing by Agent Heimbach and at trial by Harris, Federal Public Defender Claude Kelly, and others who spoke to Garrison about the staged collision scheme. Additionally, Motta/Motta Law's opposition misstates several important facts, including in ways that are contradicted by video recordings that will be played at the evidentiary hearing. For these reasons and the reasons in the government's initial motion, Garrison's statements should be admitted.

I.      **The government does not seek to admit Garrison's statements under the forfeiture by wrongdoing exception against Giles, The King Firm, or Morgan.**

As Giles, The King Firm, and Morgan recognize, the government does not seek to admit Garrison's statements against them under the forfeiture by wrongdoing exception. *See* Rec. Docs. 240 & 292. That is because Giles, The King Firm, and Morgan do not appear to have been involved in Garrison's murder. Instead, the government will seek to admit statements Garrison made through other hearsay exceptions, such as admitting his statements made during and in furtherance of the staged collision scheme as statements by a coconspirator under Federal Rule of Evidence 801(d)(E). The government anticipates that these statements will be admitted through testimony from individuals who spoke to Garrison during the conspiracy about criminal activity Garrison participated in with Giles, The King Firm, and Morgan. In its initial filing, the government quoted Harris's factual basis and Garrison's interview reports as previews for what it anticipates will be elicited at trial, including through Harris. Barring unforeseen circumstances, the government does not intend to admit Harris's factual basis or Garrison's interview reports as substantive evidence. *See United States v. McClaren*, 13 F.4th 386, 415-16 (5th Cir. 2021) (discussing circumstances when a witness's factual basis may be admitted as substantive evidence).

Morgan also takes issue with the government's assertion that any spillover prejudice caused by the admission of Garrison's statements against his codefendants can be mitigated by a limiting instruction to the jury. *See* Rec. Doc. 292, pp. 3-6. As the government explained in its initial motion, Garrison made statements to law enforcement that could more generally be used against Morgan, including that he staged collisions for members of Harris's family, as well as at least one specific statement concerning Morgan's staged collision. *See* Rec. Doc. 227-1, pp. 24-25 (describing Garrison's statement that he staged a collision involving Harris's "blind brother").

The prejudicial impact of this evidence to Morgan will be minimal because it is duplicative of other evidence that is indisputably admissible against him, including testimony by Harris, who admitted in his factual basis that Garrison staged Morgan's collision. Rec. Doc. 184, p. 2. Moreover, the Court can give the jury a limiting instruction if necessary, and the jury will presumably follow it. *See United States v. Reed*, 908 F.3d 102, 115 n.42 (5th Cir. 2018) ("We generally presume that juries follow trial court instructions."). Giles's, The King Firm's, and Morgan's oppositions largely concern issues other than forfeiture by wrongdoing, such as relevance and potential prejudice, which can be addressed at another time.

## II.     Parker's arguments against forfeiture by wrongdoing are meritless.

Citing, among other things, the Fifth Circuit's decision in *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982), Parker argues that the Court should apply the clear and convincing standard to the government's forfeiture by wrongdoing motion. *See* Rec. Doc. 340, pp. 3-6. The Fifth Circuit has addressed this issue and held that the preponderance of the evidence standard controls and not the clear and convincing standard. *United States v. Hankton*, 51 F.4th 578, 598-99 (5th Cir. 2022); *Gurrola*, 898 F.3d at 534; *United States v. Nelson*, 242 F. App'x 164, 170-71 (5th Cir. 2007); *see also Age*, 136 F.4th at 228 ("The Supreme Court expressly did not take a position on the standards necessary to demonstrate such forfeiture, but federal courts using Rule 804(b)(6), which codified the forfeiture doctrine, have generally held the prosecution to the preponderance-of-the-evidence standard.") (quotation marks and brackets omitted). Indeed, the Fifth Circuit and at least one other court have recognized that a subsequent amendment to the Federal Rules of Evidence abrogated *Thevis*, making Parker's reliance on it misplaced. *See Nelson*, 242 F. App'x at 170-71 (stating that *Thevis* "was overruled by Fed. R. Evid. 804(b)(6), so now only proof by a preponderance is required"); *Age*, 136 F.4th at 228 n.113 ("One of our

4

sister circuits—when presented with the question of which standard to apply post-amendment—found that the Federal Rules of Evidence had abrogated *Thevis*.") (citing *United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001)). Thus, contrary to Parker's claims, the preponderance of the evidence standard controls.

      Parker also argues that the Court cannot rely solely on hearsay evidence to decide the forfeiture by wrongdoing issue and, as a result, Harris should be forced to testify at the evidentiary hearing so he can be cross-examined by Parker and others. *See* Rec. Doc. 340, pp. 7-12. Parker's argument is impractical, and his claim is incorrect. Forfeiture by wrongdoing "extinguishes confrontation claims on essentially equitable grounds," meaning that it seeks to make the aggrieved party whole by admitting statements the witness would have made had they not been rendered unavailable by the bad acts of the opposing party. *See Age*, 136 F.4th at 228. It is not difficult to imagine a scenario where an abused and isolated victim made hearsay statements describing their abuse to only one or a few witnesses or recorded their statements electronically before being made unavailable by their abuser. Similarly, it is not difficult to imagine a scenario where other individuals, aware that the defendant made the witness unavailable, would be hesitant to testify at an evidentiary hearing. In its forfeiture by wrongdoing jurisprudence, the Supreme Court has explicitly recognized the potential for these problems in

5

the context of domestic violence. *See Giles v. California*, 554 U.S. 353, 377 (2008);[2] *Davis v. Washington*, 547 U.S. 813, 832-33 (2006).[3]

It therefore makes sense that the Fifth Circuit has affirmed findings of forfeiture by wrongdoing that were supported by hearsay testimony from case agents, *see Gurrola*, 898 F.3d at 535 ("The district court was entitled to rely on Agent Salloway's testimony in rendering its pre-trial ruling[.]"); *Age*, No. 16-32, 2022 WL 991759, at *3 (relying on agent's testimony during pre-trial hearing), *aff'd*, 136 F.4th at 227-29; and documentary evidence submitted as exhibits to a pretrial motion *in limine*. *See United States v. Hankton*, No. 12-201, 2016 WL 10950447, at *4 (E.D. La. June 2, 2016) (Feldman, J.), *aff'd*, 51 F.4th at 597-600. Indeed, in its holding in *Gurrola*, the Fifth Circuit quoted Federal Rule of Evidence 104(a), which states that "district courts 'are not bound by evidence rules, except those on privilege' when determining the admissibility of evidence at a pre-trial hearing." *Gurrola*, 898 F.3d at 534 n.14 (quoting Fed. R. Evid. 104(a)). Rather than signaling that the government must put on a time-consuming mini-trial featuring testimony from witnesses who have significant sentencing exposure, the Fifth

---

[2] *See Giles*, 554 U.S. at 377 ("Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.").

[3] *See Davis*, 547 U.S. at 832-33 ("Respondents in both cases, joined by a number of their *amici*, contend that the nature of the offenses charged in these two cases—domestic violence—requires greater flexibility in the use of testimonial evidence. This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.") (citation omitted) (emphasis in original).

the context of domestic violence. *See Giles v. California*, 554 U.S. 353, 377 (2008);[2] *Davis v. Washington*, 547 U.S. 813, 832-33 (2006).[3]

It therefore makes sense that the Fifth Circuit has affirmed findings of forfeiture by wrongdoing that were supported by hearsay testimony from case agents, *see Gurrola*, 898 F.3d at 535 ("The district court was entitled to rely on Agent Salloway's testimony in rendering its pre-trial ruling[.]"); *Age*, No. 16-32, 2022 WL 991759, at *3 (relying on agent's testimony during pre-trial hearing), *aff'd*, 136 F.4th at 227-29; and documentary evidence submitted as exhibits to a pretrial motion *in limine*. *See United States v. Hankton*, No. 12-201, 2016 WL 10950447, at *4 (E.D. La. June 2, 2016) (Feldman, J.), *aff'd*, 51 F.4th at 597-600. Indeed, in its holding in *Gurrola*, the Fifth Circuit quoted Federal Rule of Evidence 104(a), which states that "district courts 'are not bound by evidence rules, except those on privilege' when determining the admissibility of evidence at a pre-trial hearing." *Gurrola*, 898 F.3d at 534 n.14 (quoting Fed. R. Evid. 104(a)). Rather than signaling that the government must put on a time-consuming mini-trial featuring testimony from witnesses who have significant sentencing exposure, the Fifth

---

[2] *See Giles*, 554 U.S. at 377 ("Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.").

[3] *See Davis*, 547 U.S. at 832-33 ("Respondents in both cases, joined by a number of their *amici*, contend that the nature of the offenses charged in these two cases—domestic violence—requires greater flexibility in the use of testimonial evidence. This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.") (citation omitted) (emphasis in original).

Circuit has held that district courts can rely on information recounted by case agents during testimony at evidentiary hearings. Put differently, in some cases, hearsay may be enough to make the requisite showing for forfeiture by wrongdoing. This is one such case.

Finally, Parker criticizes courts that have found that forfeiture by wrongdoing can be established through coconspirator liability, that is, that the conduct of a coconspirator was reasonably foreseeable to a defendant. *See* Rec. Doc. 340, pp. 6-7; *see also* Rec. Doc. 262, pp. 9-16 (Motta's opposition making similar arguments). To be clear, the government does not seek to admit Garrison's statements exclusively under a *Pinkerton*/reasonable foreseeability theory. Rather, Alfortish and Parker had direct knowledge that Garrison would be killed because they participated in the murder-for-hire scheme. Motta also had direct knowledge that Garrison would be killed, and, at a minimum, acquiesced to Garrison's being made unavailable. *See* Rec. Doc. 227-1, p. 21 (government's original filing arguing, "At a minimum, Motta's history of obstructive behavior with Garrison and her close relationship to Alfortish establish that she acquiesced to Garrison's being made unavailable."). Still, to the extent coconspirator liability is an issue, ample authority supports its place in the forfeiture by wrongdoing analysis.[4]

---

[4] *See Age*, 2022 WL 991759, at *3 ("[A] co-conspirator's waiver of confrontation rights can be imputed to other participants in the conspiracy when the wrongful act at issue was in furtherance and within the scope of an ongoing conspiracy and reasonably foreseeable as a natural or necessary consequence.") (quotation marks omitted); *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015) ("The district court should have articulated that the murder . . . was within the scope of and in furtherance of the conspiracy, and that the murder was reasonably foreseeable to the defendants other than Martinez and Avila so that the forfeiture by wrongdoing doctrine applied to all who had acquiesced in wrongfully causing the declarant's unavailability.") (quotation marks omitted); *United States v. Dinkins*, 691 F.3d 358, 386 (4th Cir. 2012) ("[W]e conclude that the district court properly admitted the Dowery hearsay statements against Dinkins under the forfeiture-by-wrongdoing exception to the Confrontation Clause pursuant to Pinkerton principles of conspiratorial liability."); *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006) ("[T]he reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable, so long as their misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant[.]"). *But see United States v. Brown*, 973 F.3d 667, 700-01 (7th Cir. 2020) (questioning, without deciding, application of *Pinkerton* liability to forfeiture by wrongdoing analysis); *United States v. Richardson*, No. 19-20076, 2924 WL 961270, at *21-22 (D. Kan. Mar. 6, 2024) (rejecting application of *Pinkerton* liability to forfeiture by

7

### III.  Motta's arguments against forfeiture by wrongdoing are meritless.

There are numerous problems with Motta's opposition to the government's motion, several of which are factual and will be addressed through Agent Heimbach's testimony. For example, Motta claims that, when the news media began reporting on the staged collision scheme, "[s]he requested information from the government, defense counsel, and the Courts as to any evidence of fraud, but they refused to provide any evidence or information." Rec. Doc. 262, p. 5. Thus, Motta claims, "because she had no personal reason to believe any of her cases were fraudulent, but still had an ethical duty to represent her clients, she continued representing her clients and fought against any and all efforts by defense counsel to conduct discovery on non-parties, including Mr. Garrison." Rec. Doc. 262, p. 5. Motta ignores that she was warned repeatedly about suspicious phone contacts between individuals involved in the staged collision scheme and similarities between collisions involving plaintiffs who were family members or who otherwise knew each other.

For example, in April 2019, insurance defense attorneys filed a motion in a civil lawsuit pointing out that Garrison had multiple phone contacts the day of a staged collision with Shirley Harris, who was Ryan Harris's cousin and a plaintiff represented by Motta in a fraudulent lawsuit. *See Thomas v. Chambers*, E.D. La. No. 18-cv-4373, Doc. 175, pp. 5-6. The attorneys also pointed out that Shirley Harris lied during a deposition about whether she had ever spoken to or exchanged text messages with Garrison, including on the day of the collision. *Thomas*, E.D.

---

wrongdoing analysis because "*Pinkerton* liability was not recognized under common law at the time of the founding") (emphasis omitted).

La. No. 18-cv-4373, Doc. 175, pp. 5-6.[5] Additionally, the attorneys provided an audio recording from an individual who stated that Shirley Harris had been involved in other staged collisions and had received money from an attorney for helping stage collisions. *See Thomas*, E.D. La. No. 18-cv-4373, Doc. 196, pp. 9-10. In her order deeming the individual's testimony admissible, Judge Vance found that the individual "directly implicates [Shirley] Harris in staging other collisions." *See Thomas*, E.D. La. No. 18-cv-4373, Doc. 196, p. 10. Apparently, this and other warnings like it across multiple lawsuits were insufficient for Motta to suspect that Garrison and the Harris family might be staging collisions.

Additionally, Motta claims that, rather than obstructing Garrison's participation in a 2020 civil deposition, she in fact "facilitated" Garrison's testimony. *See* Rec. Doc. 262, pp. 7-8. This claim is baffling. As described in the government's initial motion, *see* Rec. Doc. 227-1, pp. 7-10 & n.5, Motta's increasingly unsuccessful attempts to block investigations into Garrison's role in the staged collision scheme are well-documented. By January 2020, Motta needed a new attorney to "represent" Garrison and stave off defense attorneys' attempts to question him.[6] Tellingly, in the elevator ride with Garrison to the attorney's office, Motta used the "construction" code word that referred to Alfortish's payments to Garrison for staged collisions, demonstrating her true intent for taking Garrison to meet with the attorney. After the meeting, Motta told Garrison that she would contact the insurance defense lawyers and "play stupid" about how Garrison retained the attorney. Motta's claim that she "facilitated" Garrison's

---

[5] The plaintiffs in the *Thomas* case later pleaded guilty to staging the collision with Garrison as the slammer. *See United States v. Clark*, E.D. La. No. 23-cr-176, Docs. 110 & 208 (factual bases for Shirley Harris and Antoine Clark).

[6] The video recording of the January 2020 meeting in the attorney's office shows Motta not only remaining in the attorney's office for the entire meeting, despite her not representing Garrison and thus destroying the attorney-client privilege, but also directing the meeting and telling this attorney that Garrison "doesn't even know the parties" in Motta's case.

testimony in the civil deposition is simply wrong, particularly where she found it necessary to conceal her role in the representation by "play[ing] stupid." Her conduct around the meeting and at other points during 2020 supports a finding that she sought to make Garrison an unavailable witness.

## CONCLUSION

For the foregoing reasons, as well as the reasons in the government's original motion, *see* Rec. Doc. 227, the government respectfully requests that the Court enter an order admitting statements to law enforcement and others by Cornelius Garrison under the forfeiture by wrongdoing exception.

Respectfully submitted,

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY


/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
BRIAN M. KLEBBA
MARY KATHERINE KAUFMAN
Assistant United States Attorneys
J. RYAN McLAREN
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Matthew R. Payne*
MATTHEW R. PAYNE
Assistant United States Attorney