## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 24-105** |
| **RYAN HARRIS, ET AL.** | **SECTION: D (1)** |
| | **This Order applies to all defendants named in the Third Superseding Indictment** |

### ORDER AND REASONS

Before the Court is the Government's Motion to Admit Statements Under the Forfeiture by Wrongdoing Exception.[1]  Defendants, Jason F. Giles, the King Firm, LLC, Vanessa Motta, Motta Law, LLC, Carl G. Morgan, and Leon M. Parker oppose the Motion,[2] and the Government has filed a Reply.[3]  The Court held evidentiary hearings on the Motion on December 5, 2025 and December 12, 2025, during which it reviewed exhibits, heard testimony from Special Agent Michael Heimbach of the Federal Bureau of Investigation, attorney Jason Baer, and attorney Bradley Egenberg, and reviewed a portion of the video deposition of Cesar Lobo Ramos taken on September 19, 2025.[4]

---

[1] R. Doc. 227.
[2] *See* R. Docs. 240, 262, 292, & 340.
[3] R. Doc. 346.
[4] R. Docs. 502, 504, 529, & 530.

After careful consideration of the parties' memoranda, the record, the evidence presented at the December 5, 2025 hearing, and the applicable law, the Motion is **GRANTED in part and DEFERRED in part.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND[5]

On December 6, 2024, the grand jury in the United States District Court for the Eastern District of Louisiana returned a superseding indictment in this case charging Sean D. Alfortish, Vanessa Motta, Motta Law, LLC, Jason F. Giles, The King Firm, LLC, Leon M. Parker, Diaminike F. Stalbert, Carl G. Morgan, and Timara N. Lawrence with various crimes arising from a years-long scheme to stage fake automobile collisions in the New Orleans metropolitan area and file fraudulent insurance claims and fraudulent lawsuits based on the staged collisions.[6]  On April 25, 2025, a grand jury returned a second superseding indictment, charging Parker and Alfortish with five additional crimes stemming from the September 22, 2020 murder of Cornelius Garrison, an alleged "slammer" who purportedly staged collisions for Alfortish, Motta, Motta Law, Giles, and the King Firm.[7]  On January 9, 2026, a grand jury returned a third superseding indictment, charging Parker with an additional count of mail fraud, charging Alfortish, Motta, and Motta Law with an additional count of mail fraud, charging Alfortish with obstruction of justice and

---

[5] In the interest of judicial economy, and because the factual background of this case was extensively detailed in the Court's July 25, 2025 Order and Reasons (R. Doc. 357), the Court will limit its recitation of the factual and procedural background to matters relevant to the instant Motion.

[6] R. Doc. 78.

[7] R. Doc. 256.  On September 18, 2020, four days before his murder, a federal grand jury in the Eastern District of Louisiana charged Garrison and eight codefendants in a seven-count indictment related to staged automobile collisions.  *See* R. Doc. 1 in *United States of America v. Cornelius Garrison, et al.*, Crim. A. No. 20-92-SSV-KWR (E.D. La.).

subornation of perjury concerning a Fed. R. Crim. P. 15 deposition, and adding 11 new staged accidents to the conspiracy to commit mail and wire fraud charged in count 1 of the second superseding Indictment.[8]

In the third superseding indictment, the Government alleges that Garrison began covertly cooperating with the federal government concerning the staged collision scheme in October 2019, and that his indictment contained information that he provided over the course of his cooperation in the federal criminal investigation.[9] The Government's theory in this case, at least with respect to Garrison's murder, is that Alfortish and Parker conspired to murder Garrison in retaliation for his past cooperation with law enforcement and to prevent him from otherwise cooperating with law enforcement regarding the staged collision scheme.[10]

In the instant Motion, the Government seeks an order admitting the following three categories of statements at trial: (1) statements made by Garrison "to law enforcement and others" against Alfortish, Parker, Motta, and Motta Law under the forfeiture by wrongdoing exception to the hearsay rule set forth in Federal Rule of Evidence 804(b)(6); (2) statements made by Garrison to defendant, Ryan Harris,[11]

---

[8] R. Doc. 517. *See Id.* at pp. 13–16, 18–19, 19–20 & 26–27 (counts 1, 3, 5, 16, and 17).

[9] R. Doc. 517 at p. 3, ¶ 10 & p. 22, ¶ 2.

[10] *Id.* at pp. 22–26.

[11] On May 3, 2024, the grand jury returned the first indictment in this case, initially under seal, charging Ryan J. Harris and Jovanna R. Gardner in a five-count indictment related to the staged automobile collisions and Garrison's murder. R. Doc. 1. The Government filed a superseding bill of information for conspiracy to commit witness tampering as to Gardner on June 18, 2024, and she entered a guilty plea that same day. R. Docs. 45 & 46. Gardner is currently awaiting sentencing. R. Doc. 447. On December 6, 2024, the Government filed a ten-count superseding indictment charging Harris, Alfortish, Motta, Motta Law, Giles, the King Firm, Parker, Stalbert, Morgan, and Lawrence with various crimes related to the staged automobile collision scheme and Garrison's murder. R. Doc. 78. On January 13, 2025, the Government filed a superseding bill of information as to Harris, charging him with conspiracy to commit mail and wire fraud, wire fraud, and causing death through the use of

against Giles and the King Firm under the hearsay exception for coconspirator statements set forth in Federal Rule of Evidence 801(d)(2)(E); and (3) statements made by Garrison that indirectly implicate Morgan and Stalbert in participating in staged collisions.[12]  The Government contends that Garrison's cooperation with the federal investigation into the staged collision scheme was "extensive," and that Garrison implicated Alfortish, Motta, Giles, Harris, and Harris's family members in the staged collision scheme.[13]  The Government claims that Garrison told federal agents in November 2019 that he staged collisions for Giles, the King Firm, Motta, Alfortish, and Motta Law,[14] and that he also provided information regarding Alfortish's role in the scheme and the attempts by Motta and Alfortish to make him an unavailable witness.[15]  The Government further asserts that in pleading guilty to his conduct regarding Garrison's murder, Ryan Harris admitted in his Factual Basis that he, Alfortish, Motta, and Parker learned about Garrison's cooperation in 2020, and that Harris facilitated a meeting between Alfortish and Parker for Alfortish to

_____

[12] R. Doc. 227; R. Doc. 227-1 at p. 1. The Government notes that the remaining defendant, Lawrence, is not implicated by its Motion. R. Doc. 227-1 at p. 1. While the Government asserts that it seeks to admit Garrison's statements based upon the exhibits attached to its Motion, it also claims that it will make FBI Special Agent Michael Heimbach available for any evidentiary hearing. *Id*. at pp. 1–2.

[13] R. Doc. 227-1 at pp. 5–6 (*citing* R. Doc. 78 at pp. 5 & 17; R. Doc. 227-5 at p. 1). The Court notes that the Government cites to the superseding indictment (R. Doc. 78) throughout its Motion because the Motion was filed a month before the second superseding indictment was filed (R. Doc. 256) and more than nine months before the third superseding indictment was filed (R. Doc. 517).

[14] R. Doc. 227-1 at p. 6 (*citing* R. Doc. 227-5 at pp. 1–2).

[15] R. Doc. 227-1 at pp. 6–10 (*citing* R. Doc. 227-6 at pp. 2–3; R. Doc. 227-7 at p. 2; R. Doc. 227-8 at p. 2; R. Doc. 227-10 at pp. 1–2; R. Doc. 227-11 at p. 2; R. Doc. 227-12; R. Doc. 227-13; R. Doc. 227-14; R. Doc. 227-15; R. Doc. 227-16; R. Doc. 227-17; R. Doc. 227-18). The Government notes that it has a video recording of an interaction between Motta and Garrison during which Motta advised Garrison that he would get along with his new attorney because the attorney knew about the "construction" – a reference to the cover story Alfortish had instructed Garrison to use if anyone asked him why he had received so much money from Alfortish and Motta. R. Doc. 227-1 at pp. 8–9 & n.6 (*citing* R. Doc. 227-11 at p. 2). The video was shown during the hearing.

a firearm. R. Doc. 180. Harris entered a guilty plea as to all three counts of the superseding bill of information on January 16, 2025 and is awaiting sentencing. R. Docs. 182 & 395.

pay Parker to murder Garrison.[16]  The Government points out that Harris also admitted that Alfortish told him that he and Motta had offered to pay Garrison to convince Garrison not to cooperate with the investigation, and that, "Alfortish, Motta, and Parker commented to Harris that Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison were dead."[17]  The Government claims that these statements are corroborated by statements in defendant Jovanna Gardner's Factual Basis,[18] cell phone data,[19] and the testimony of FBI Special Agent Michael Heimbach at Parker's detention hearing.[20]

With respect to the forfeiture by wrongdoing exception under Rule 804(b)(6), the Government asserts that Garrison's statements to law enforcement should be admissible against Parker because there is substantial evidence showing that Parker was involved in Garrison's murder.[21]  The Government likewise asserts that Garrison's statements should be admissible against Alfortish because Garrison alerted law enforcement to multiple attempts by Motta and Alfortish to silence him, and because Alfortish arranged for Garrison's murder.[22]  The Government contends that Garrison's statements should be admitted against Motta and Motta Law based upon Motta's repeated efforts to prevent Garrison from talking to anyone about the

---

[16] R. Doc. 227-1 at pp. 10–11 (*citing* R. Doc. 184 at pp. 4–5).
[17] R. Doc. 227-1 at pp. 10–11 (*quoting* R. Doc. 184 at pp. 4–5) (citation modified).
[18] R. Doc. 227-1 at pp. 11–12 (*quoting* R. Doc. 49 at pp. 2–3) (citation modified).
[19] R. Doc. 227-1 at pp. 12–13.
[20] *Id.* at pp. 13–15 (*citing* R. Doc. 227-19 at pp. 27–29, 31, 37–43).
[21] R. Doc. 227-1 at p. 20 (*citing* R. Doc. 184 at pp. 4–5; R. Doc. 227-11 at p. 2; *United States v. Hankton*, 51 F.4th 578, 598 (5th Cir. 2022), *aff'd in part, vacated in part, and remanded* by *United States v. Hankton*, 51 F.4th 578, 598–99 (5th Cir. 2022)).
[22] R. Doc. 227-1 at p. 21 (*citing* R. Doc. 184 at pp. 4–5; R. Doc. 227-10 at p. 1; R. Doc. 227-15; R. Doc. 227-16; R. Doc. 227-17; R. Doc. 227-19 at pp. 38–43).

staged collision scheme, which the Government claims demonstrated her "bad intent" and desire to make Garrison an unavailable witness.[23]  The Government also asserts that Motta and Alfortish's romantic relationship and the fact that they worked closely together in the staged collision scheme suggests that Alfortish's criminal behavior should be imputed to Motta or, at a minimum, that Motta acquiesced to Garrison being made unavailable.[24]

As to the admissibility of coconspirator statements under Rule 801(d)(2)(E), the Government asserts that statements made by Garrison to Harris during and in furtherance of the staged collision scheme should be admissible against Giles and the King Firm.[25]  Finally, the Government asserts that it does not intend to admit Garrison's statements against defendants, Stalbert and Morgan, but that certain statements admitted against other defendants will implicate them in the staged collision scheme.[26]  The Government points to statements regarding Garrison's involvement in a staged collision in which Stalbert was a passenger and his involvement in another collision involving Harris's "blind brother."[27]  The Government asserts that Harris does not have a blind brother, but that he has a blind uncle who was a passenger in a staged collision involving Morgan.[28]  The Government argues that these statements should be admissible against Parker, Alfortish, Motta,

---

[23] R. Doc. 227-1 at pp. 21–22.
[24] *Id.* at p. 22 (citing *United States v. Sanders*, 952 F.3d 263, 275 (5th Cir. 2020); *United States v. Hankton*, Crim. A. No. 12-201, 2016 WL 10950447, at *3 (E.D. La. June 2, 2016) (Feldman, J.)).
[25] R. Doc. 227-1 at pp. 22–24 (*citing* R. Doc. 184 at pp. 1–2; *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007)).
[26] R. Doc. 227-1 at p. 24.
[27] *Id.* (*citing* R. Doc. 78 at p. 15).
[28] R. Doc. 227-1 at p. 24 (*citing* R. Doc. 227-7 at p. 2; R. Doc. 78 at p.15).

and Motta Law because they are relevant to establishing the existence of a conspiracy.[29] The Government seems to suggest that the Court can provide a limiting instruction to the jury that these statements are not admissible against Morgan and Stalbert.[30]

Giles and the King Firm oppose the Motion, asserting that Garrison's statements are not admissible against them under the forfeiture by wrongdoing exception in Rule 804(b)(6) because there is no evidence that they had any involvement in Garrison becoming an unavailable witness.[31] As such, Giles and the King Firm contend that Garrison's alleged statements regarding them are inadmissible hearsay.[32] Giles and the King Firm further claim that they have asked the Government to provide any and all statements made by Garrison that it intends to admit against them at trial, but that the Government has declined and they intend to file additional motions to address this issue.[33] As such, Giles and the King Firm ask the Court to prohibit and exclude any use, reference, evidence, testimony, or argument regarding any of Garrison's alleged statements against them.[34]

---

[29] R .Doc. 227-1 at p. 24.

[30] *Id*. at pp. 24–25. The Court notes that the Government further asserts that the Court can rule on its Motion without an evidentiary hearing. *Id*. at p. 25. That issue, however, is moot, as the Court held evidentiary hearings on December 5, 2025 and December 12, 2025. *See* R. Docs. 269, 281, 326, 351, 421, 463, 472, 502 & 504.

[31] R. Doc. 240.

[32] *Id*. at p. 1.

[33] *Id*. at p. 2. The Court notes that Giles and the King Firm subsequently filed a Motion for Pre-Trial Hearing, Advance Proffer, and Ruling on the Admissibility of Alleged Co-Conspirator Statements (R. Doc. 480), addressing the admissibility of the statements at issue in the instant Motion. The Court denied that motion on November 1, 2025. R. Doc. 480.

[34] R. Doc. 240 at p. 2.

Motta and Motta Law (the "Motta Defendants") also oppose the Motion, asserting that Garrison's statements are not admissible against them under the forfeiture by wrongdoing exception because the Government failed to prove by a preponderance of the evidence that Motta wrongfully and intentionally made Garrison unavailable to testify at trial.[35] Contrary to the Government's position, the Motta Defendants assert that Motta's actions, including helping Garrison secure another attorney, Bradley Egenberg, to represent him in a civil matter, demonstrate her intent to ensure that Garrison was an available witness and able to provide deposition testimony.[36] The Motta Defendants further claim that Motta never met with Harris, Alfortish, and Parker, and that she never said that "Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison was dead." [37] The Motta Defendants then assert that Alfortish's alleged criminal behavior and resulting forfeiture of his confrontation rights cannot be imputed to Motta because Garrison's murder was not in the scope of, or a reasonably foreseeable consequence of, the staged collision scheme.[38]

The Motta Defendants likewise claim that Alfortish's actions cannot be imputed to them based upon Motta's romantic relationship with Alfortish and the fact that they worked closely together on the staged collision scheme.[39] The Motta

---

[35] R. Doc. 262 at pp. 1 & 7–9 (citing *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008)).

[36] R. Doc. 262 at pp. 4 & 7–8.

[37] *Id*. at p. 8.  *See* R. Doc. 227-1 at p. 11 (*quoting* R. Doc. 184 at pp. 4–5).

[38] R. Doc. 262 at pp. 9–13 (citing *United States v. Age*, Crim. A. No. 16-32, 2022 WL 991759, at *3 (E.D. La. Apr. 1, 2022) (Ashe, J.), *aff'd* 136 F.4th 193 (5th Cir. 2025), *cert. denied Age v. United States,* 2025 WL 3198617 (Nov. 17, 2025)).

[39] R. Doc. 262 at p. 14.

Defendants assert that the case relied upon by the Government for this "new imputation theory," *United States v. Sanders*, is irrelevant because it did not address the forfeiture by wrongdoing exception set forth in Rule 804(b)(6).[40]   The Motta Defendants argue that there is no legal support for imputing a coconspirator's acts under the forfeiture by wrongdoing exception based solely upon a relationship between the coconspirators.[41]   Finally, the Motta Defendants assert that the Government cannot show by a preponderance of the evidence that she acquiesced to Garrison's murder, and further argue that the case relied upon by the Government, *United States v. Hankton*, is distinguishable.[42]   The Motta Defendants request an evidentiary hearing on the Government's Motion to determine the statements at issue, to receive testimony from the FBI agent, Harris, and Bradley Egenberg, and to prevent the limitless admission of all statements attributed to Garrison.[43]

Morgan also opposes the Government's Motion to the extent that the Government seeks to admit alleged coconspirator statements made by Garrison against Giles and the King Firm under Fed. R. Evid. 801(d)(2)(E) and to the extent that the Government intends to admit statements made by Garrison that accuse Ryan Harris's "blind brother" of being in a staged accident.[44]   According to Morgan, the Government claims that it intends to introduce statements Garrison made to

---

[40] *Id*. at pp. 14– 15 (citing *United Staes v. Sanders*, 952 F.3d 263, 275 (5th  Cir. 2020)).

[41] R. Doc. 262 at pp. 15 & 16 (citing *United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000); *United States v. Dinkins*, 691 F.3d 358, 385 (4th Cir. 2012)).

[42] R. Doc. 262 at pp. 16–20 (citing *Hankton*, Crim. A. No. 12-01, 2016 WL 10950447 (E.D. La. June 2, 2016), *aff'd in part, vacated in part, and remanded* 51 F.4th 578 (5th Cir. 2022), *cert. denied Hankton v. United States*, 143 S.Ct. 839, 215 L.Ed.2d 82 (2023)).

[43] R. Doc. 262 at pp. 21–24.

[44] R. Doc. 292 at p. 1 (*citing* Fed. R. Evid. 801(d)(2)(E); R. Doc. 227-1 at pp. 23–25).

Harris, including that certain of their staged collisions were directed to Giles and the King Firm, and the Government cites a portion of Harris's Factual Basis in support of its position.[45]  Morgan asserts that the portion of Harris's Factual Basis cited by the Government includes a statement that Garrison and Morgan, along with others, staged a collision on April 12, 2017, and that they conspired with Alfortish, Motta, and Motta Law to file and pursue a fraudulent lawsuit based on the staged collision.[46] Morgan objects to the admission of that statement because it is not a statement by Garrison, nor can it be construed as being made during and in furtherance of the conspiracy, and is instead testimonial hearsay.[47]  Morgan further objects to the Government's intent to admit a statement by Garrison regarding Harris's blind brother being in a staged accident, which appears connected to the allegation in the second superseding indictment that Daniel Harris, who is blind, was a passenger in an accident staged by Morgan on April 12, 2017.[48] Morgan argues that this statement will be cumulative of other evidence at trial, including evidence that will be used by the Government to establish a multi-member conspiracy, demonstrate a relationship between Garrison and Ryan Harris, and establish that Garrison staged accidents with Harris's family members.[49]  Morgan contends that the statement should be excluded as unfairly prejudicial under Fed. R. Evid. 403, as constituting hearsay within hearsay under Fed. R. Evid. 805, and violative of his confrontation clause

---

[45] R. Doc. 292 at p. 2 (*citing* R. Doc. 184 at pp. 1–2).
[46] R. Doc. 292 at p. 2.
[47] *Id*. at pp. 2–3.
[48] *Id*. at pp. 3–4 (*citing* R. Doc. 227-7; R. Doc. 256 at p. 14).
[49] R. Doc. 292 at p. 5.

rights.[50]  Morgan also claims that a limiting instruction will not be sufficient to cure these problems.[51]

Parker also opposes the Government's Motion, asserting that Garrison's statements constitute inadmissible hearsay that is barred by the confrontation clause and that the Government has not and will not be able to establish that the forfeiture by wrongdoing exception applies to him.[52]  Parker argues that, to the extent the Government suggests that Rule 804(b)(6) can be triggered through conspiratorial liability, the Court should reject that position because that issue is *res nova* in the Fifth Circuit.[53]  Parker also asserts that an evidentiary hearing is required because neither the exhibits attached to the Government's Motion nor the testimony from the FBI agent during his detention hearing establish Parker's responsibility for Garrison's murder or that he had the intent required for Rule 804(b)(6) to apply.[54] Parker claims that the only direct evidence cited by the Government regarding his alleged participation in Garrison's murder comes from Harris's Factual Basis, which is pure hearsay.[55]  As such, Parker requests that the Court allow for supplemental briefing on the Rule 804(b)(6) issue after all relevant evidence is adduced at the

---

[50] *Id*. at pp. 5–6.

[51] *Id*. at p. 4.

[52] R. Doc. 340 at pp. 1–2.  The Court notes that Parker also objects to the Court holding an evidentiary hearing on the Government's Motion on July 15, 2025, claiming that additional time is necessary to prepare an adequate defense.  *Id*. at pp. 2–3.  Because the Court has since continued and reset the evidentiary hearing for December 5, 2025, this argument is now moot.  *See* R. Docs. 326, 351, 421, 463, & 472.  Parker also asserts that the Court should not quash the subpoena for Ryan Harris to testify at the evidentiary hearing, which was requested by the Motta Defendants.  R. Doc. 340 at pp. 11–12. That argument is likewise moot, as the Court denied the Government's Motion to Quash Subpoenas (R. Doc. 333) on July 10, 2025.  R. Doc. 351.  Further, the Motta Defendants eventually withdrew that subpoena request.

[53] R. Doc. 340 at pp. 6–7.

[54] *Id*. at pp. 7–11.

[55] *Id*. at p. 11.

evidentiary hearing and to ultimately deny the Government's Motion, and reserves his right to raise any additional evidentiary or constitutional objections to any evidence the Government seeks to introduce against him at trial.[56]

In response, the Government asserts that the defendants misunderstand the Government's descriptions of the testimony that will be provided at the hearing and at trial, and that the Motta Defendants misstated several important facts that will be contradicted by video recordings that will be played at the evidentiary hearing.[57] Addressing the arguments raised by Giles, the King Firm, and Morgan, the Government asserts that it does not intend to admit Harris's Factual Basis or Garrison's interview reports as substantive evidence; instead, the Government anticipates Harris testifying at trial regarding statements made by Garrison during and in furtherance of the conspiracy, which will be admissible under Rule 801(d)(2)(E).[58] Turning to Morgan's concerns regarding spillover prejudice caused by the admission of Garrison's statements against his codefendants, the Government maintains that any prejudice will be minimal because the statements are duplicative of evidence that will be admissible against Morgan, including Harris's testimony, and because a limiting instruction can be given.[59]

The Government further asserts that Parker's reliance on *United States v. Thevis* to argue that the Government must prove the admissibility of statements under the forfeiture by wrongdoing exception by clear and convincing evidence is

---

[56] *Id.* at pp. 12–13.
[57] R. Doc. 346 at pp. 1–2.
[58] *Id.* at p. 3.
[59] *Id.* at pp. 3–4.

misplaced, as the Fifth Circuit has made clear that the standard is a preponderance of the evidence.[60]  The Government also asserts that Parker's argument that the Court cannot rely solely on hearsay evidence to decide the forfeiture by wrongdoing issue is also incorrect, and that the Fifth Circuit has affirmed the application of the forfeiture by wrongdoing exception when supported by hearsay testimony from case agents.[61]  To the extent Parker contends that the forfeiture by wrongdoing exception cannot be established through coconspirator liability, i.e. because the conduct of a coconspirator was reasonably foreseeable, the Government clarifies that it does not seek to admit Garrison's statements exclusively under a *Pinkerton*/reasonable foreseeability theory, but that "ample authority supports its place in the forfeiture by wrongdoing analysis."[62]  The Government further asserts that the Motta Defendants' arguments are also meritless, and that many of the factual inaccuracies asserted by the Motta Defendants will be addressed through Agent Heimbach's testimony.[63]  While the Motta Defendants claim that Motta had no reason to believe any of her cases were fraudulent, the Government argues that Motta was warned repeatedly across multiple lawsuits that Garrison and the Harris family might be staging

---

[60] *Id.* at pp. 4–5 (citing *Thevis*, 665 F.2d 616 (5th Cir. 1982); *United States v. Hankton*, 51 F.4th 578, 598–99 (5th Cir. 2022)).

[61] R. Doc. 346 at pp. 5–7 (citing *United States v. Gurrola*, 898 F.3d 524, 535 (5th Cir. 2018); *United States v. Age*, Crim. A. No. 16-32, 2022 WL 991759, at *3 (E.D. La. April 1, 2022); *United States v. Hankton*, Crim. A. No. 12-201, 2016 WL 10950447, at *4 (E.D. La. June 2, 2016)).

[62] R. Doc. 346 at pp. 7–8 (citing *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Age*, Crim. A. No. 16-32, 2022 WL 991759 at *3; *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015); *United States v. Dinkins*, 691 F.3d 358, 386 (4th Cir. 2012); *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006)).  As explained by the Fifth Circuit, "[U]nder the *Pinkerton* doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable *and* committed in furtherance of the conspiracy." *United States v. Armstrong*, 619 F.3d 380, 387 (5th Cir. 2010) (quoting *United States v. Gonzalez*, 570 F.3d 16, 26 n.8 (1st Cir. 2009)) (citation modified) (emphasis in original).

[63] R. Doc. 346 at p. 8.

collisions.[64]  The Government also asserts that Motta's claim that she facilitated, rather than obstructed, Garrison's testimony "is baffling" because her unsuccessful attempts to block investigations into Garrison's role in the staged collision scheme "are well-documented."[65]

On November 25, 2025, Alfortish filed an Opposition brief, asserting that he "will present his factual arguments at the conclusion of the December 5, 2025 evidentiary hearing, as well as in any post-hearing briefing this Court may allow."[66] Alfortish claims that the Court's ruling on this Motion "will be the most significant evidentiary ruling it makes in Mr. Alfortish's trials," as he faces a life sentence if convicted.[67]  Raising concerns about his confrontation clause rights under the Sixth Amendment, Alfortish joins Parker in objecting to the use of a preponderance of the evidence standard.[68]  Alfortish recognizes that this Court "is bound by Fifth Circuit precedent," but nonetheless preserves this objection.[69]  Alfortish also objects to the application of "the imputation theory," as briefed by Parker and Motta.[70]

## II.    LEGAL STANDARD

The Confrontation Clause in the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[71]  According to the Supreme Court, "[t]he [Sixth] amendment

---

[64] *Id*. at pp. 8–9.
[65] *Id*. at pp. 9–10.
[66] R. Doc. 487 at p. 1.
[67] *Id*.
[68] *Id*.
[69] *Id*. at pp. 1–2.
[70] *Id*. at p. 2.
[71] U.S. CONST. amend VI.

contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."[72]  The Fifth Circuit has recognized that the Confrontation Clause's goal of ensuring the reliability of evidence through cross-examination "is a procedural rather than a substantive guarantee."[73]

There are, however, two exceptions to this constitutional guarantee.[74]  The first is for "declarations made by a speaker who was both on the brink of death and aware that he was dying."[75]  The second, which is at issue here, is for "statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant."[76]  Now codified in Federal Rule of Evidence 804(b)(6), the forfeiture by wrongdoing exception to the hearsay rule allows for the admission of statements "offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result."[77]  The forfeiture by wrongdoing exception applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying."[78]  According to the Fifth

[72] *Giles v. California*, 554 U.S. 353, 358, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).
[73] *United States v. Age*, 136 F.4th 193, 227–28 (5th Cir. 2025) (quoting *Crawford*, 541 U.S. at 61, 124 S.Ct. 1354) (citation modified).
[74] *Age*, 136 F.4th at 228 (citing *Giles*, 554 U.S. at 358–59, 128 S.Ct. 2678).
[75] *Giles*, 554 U.S. at 358, 128 S.Ct. 2678.
[76] *Giles*, 554 U.S. at 359 & 367, 128 S.Ct. 2678 (quoting *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)) (citation modified).
[77] Fed. R. Evid. 804(b)(6).  *See Davis*, 547 U.S. at 833, 126 S.Ct. 2266 (acknowledging that Fed. R. Evid. 804(b)(6) codifies the forfeiture by wrongdoing doctrine).
[78] *Age*, 136 F.4th at 228 (quoting *Giles*, 554 U.S. at 359, 128 S.Ct. 2678) (citation modified) (emphasis in original).

Circuit, the forfeiture by wrongdoing exception "extinguishes confrontation claims on essentially equitable grounds."[79]  Further, "[t]he party invoking the rule carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable."[80]

Under the foregoing authority, the Government must demonstrate by a preponderance of the evidence that: (1) Parker, Alfortish, Motta, and Motta Law were involved in, or responsible for, procuring Garrison's unavailability "through knowledge, complicity, planning or in any other way;" and (2) Parker, Alfortish, Motta, and Motta Law acted with the intent of procuring Garrison's unavailability as an actual or potential witness.[81]  As to the second requirement, the Supreme Court has recognized that knowledge is not sufficient to show intent.[82]  Other Circuits have held that the government need not "show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant was

---

[79] *United States v. Hankton*, 51 F.4th 578, 598 (5th Cir. 2022) (quoting *Davis v. Washington*, 547 U.S. 813, 833, 1126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)) (citation modified).

[80] *Hankton*, 51 F.4th at 598–99 (citing *Davis*, 547, U.S. at 833, 126 S.Ct. 2266).  See *Age*, 136 F.4th at 227–28 (quoting *Davis*, 547 U.S. at 833, 126 S.Ct. 2266) (rejecting defendants' argument that the district court abused its discretion by admitting statements under the preponderance of the evidence standard, explaining that, "[t]he Supreme Court expressly did not take a position on the standards necessary to demonstrate such forfeiture, but federal courts using rule 804(b)(6), which codified the forfeiture doctrine, have generally held the Prosecution to the preponderance-of-the-evidence standard."); *United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018) (citing authority) ("The party offering this evidence must make this showing by a preponderance of the evidence.").

[81] *United States v. Age*, Crim. A. No. 16-32, 2022 WL 991759, at *3 (E.D. La. April 1, 2022) (quoting *United States v. Dhinsa*, 243 F.3d 635, 653–64 (2nd Cir. 2001)) (citation modified).  See *Giles v. California*, 554 U.S. 353, 361, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (emphasis in original) ("The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying.").

[82] *Giles*, 554 U.S. 353, 368, 128 S.Ct. 2678 ("Every commentator we are aware of has concluded the requirement of intent 'means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.'  The commentators come out this way because the dissent's claim that knowledge is sufficient to show intent is emphatically *not* the modern view.") (citation and internal citations omitted) (emphasis in original).

motivated *in part* by a desire to silence the witness."[83]  Additionally, the Fifth Circuit has held that conspiratorial liability under *Pinkerton v. United States* can be used to bolster a district court's finding that a defendant caused or acquiesced in the murder of a witness.[84]

As to the evidentiary hearing, the Fifth Circuit has noted that, "[d]istrict courts are not bound by evidence rules, except those on privilege when determining the admissibility of evidence at a pre-trial hearing."[85]  Thus, a district court may rely on hearsay statements, including the testimony of FBI and case agents, in making a pretrial determination of the admissibility of statements under Rule 804(b)(6).[86] Further, while it does not appear that the Fifth Circuit has addressed the scope of the statements that can be admitted under Rule 804(b)(6), other circuits have held that, "Rule 804(b)(6) places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial to prove that the defendant murdered the declarant."[87]

---

[83] *United States v. Dhinsa*, 243 F.3d 635, 654 (2d Cir. 2001) (quoting *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996)) (citation modified) (emphasis in original).  *See United States v. Johnson*, 219 F.3d 349, 356 (4th Cir. 2000).

[84] *United States v. Hankton*, 51 F.4th 578, 599–600 (5th Cir. 2022) (citing *Pinkerton*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)) ("The district court's reference to conspiratorial liability merely bolstered its conclusion that Telly's imprisonment at the time Williams was murdered did not preclude a finding that Telly caused or acquiesced in Williams's murder.  *See* Fed. R. Evid. 804(b)(6).").

[85] *United States v. Gurrola*, 898 F.3d 524, 534, n.14 (5th Cir. 2018) (*quoting* Fed. R. Evid. 104(a)).

[86] *Gurrola*, 898 F.3d at 535 (*citing* Fed. R. Evid. 104(a)) ("The district court was entitled to rely on Agent Salloway's testimony in rendering its pre-trial ruling and, consequently, it did not abuse its discretion by admitting Carlos's testimony under Rule 804(b)(6)."). *See United States v. Age*, Crim. A. No. 16-32, 2022 WL 991759, at *4, n.16 (E.D. La. Apr. 1, 2022) (citing *Gurrola*, 898 F.3d at 535, n.14).

[87] *United States v. Dhinsa*, 243 F.3d 635, 653 (2d Cir. 2001).  See *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999) ("[Fed. R. Evid. 804(b)(6)] contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence."); *United States v. Cherry*, 217 F.3d 811, 814 (10th Cir. 2000) ("We therefore read the plain language of Rule 804(b)(6) to permit the admission of those hearsay statements that would be admissible under the constitutional doctrine of waiver by misconduct, and hold that, in the context of criminal proceedings, the Rule permits the admission of hearsay statements by unavailable witnesses against defendants if those statements are

### III.    ANALYSIS

**A. The admissibility of coconspirator statements made by Garrison to Harris under Fed. R. Evid. 801(d)(2)(E).**

As previously noted, the Court issued an Order and Reasons on November 21, 2025 denying a Motion for Pre-Trial Hearing, Advance Proffer, and Ruling on the Admissibility of Alleged Co-Conspirator Statements that was filed by Giles and the King Firm.[88] In that ruling, the Court denied a request from Giles and the King Firm to hold a pre-trial hearing regarding the admissibility of statements made by Garrison to Harris under Fed. R. Evid. 801(d)(2)(E) pursuant to *United States v. James*.[89] The Court concluded that holding a pre-trial *James* hearing to determine the admissibility of coconspirator statements would be impractical, unnecessary, wasteful, and would result in a mini-trial of considerable length, given the nature of the conspiracy alleged in count one of the second superseding indictment.[90] The Court determined that it would be more appropriate to defer ruling on the admissibility of the coconspirator statements "until trial, at which point the Court will be in a better position to evaluate the merits of" the parties' arguments.[91] The Court therefore denied the Motion for Pre-Trial Hearing. The Court, however, made clear that it would make a determination regarding the admissibility of the

---

otherwise admissible under the doctrine of waiver by misconduct."); *United States v. Jordan*, Crim. A. No. 3:18-CR-67-CWR-LGI-2, 2021 WL 1030996, at *2 (S.D. Miss. Mar. 17, 2021) (Reeves, J.) (holding that Rule 804(b)(6) permits the admission of statements related to the underlying drug crime for which the defendant was indicted and the subsequent shooting of the declarant that rendered him unavailable).

[88] R. Doc. 480.  *See* R. Doc. 280.

[89] 590 F.2d 575, 582 (5th Cir. 1979).

[90] R. Doc. 480 at p. 8.

[91] *Id.*

coconspirator statements during trial "whenever reasonably practicable," as required under Fifth Circuit jurisprudence.[92]

To the extent that the Government asserts in the instant Motion that certain statements made by Garrison to Harris should be admissible against Giles and the King Firm under Rule 801(d)(2)(E), the Court will defer ruling on that portion of the Motion until trial for the reasons stated above.

### B. The admissibility of Garrison's statements against Alfortish, Parker, Motta, and Motta Law under Fed. R. Evid. 804 (b)(6).

During the hearing held on December 5, 2025, the Government introduced exhibits and presented testimony from Special Agent Michael Heimbach, an FBI agent in New Orleans assigned to the Homeland Security Task Force who investigated Garrison's murder.[93]  In addition to other exhibits, the Government introduced 31 exhibits consisting of FD-302 Reporting Documents ("302 Reports") and FD-1023 Reporting Documents ("1023 Reports") concerning interviews with Garrison.[94]  Agent Heimbach explained that 302 Reports document the FBI's interactions with an individual and to document search warrants, while 1023 Reports are used for source reporting and  to conceal the identity of the person providing the information.[95]

---

[92] *Id.* at p. 9 (citing *United States v. Fragoso*, 978 F.2d 896, 900 (5th Cir. 1992) (quoting *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979)) (citation modified).
[93] R. Doc. 529, Transcript from December 5, 2025 hearing.
[94] Govt Exhs. 1-31.
[95] R. Doc. 529 at p. 73.

### 1. *Sean Alfortish and Leon Parker*

Agent Heimbach testified that he investigated Garrison's murder and described Garrison as a slammer who staged car accidents on behalf of the defendants in this case.[96]  Agent Heimbach described Motta as a personal injury attorney in New Orleans, described Alfortish as a co-conspirator and Motta's romantic partner, described Parker as someone who participated in staged accidents and in Garrison's murder, and described Harris as a slammer who also participated in the murder.[97] During the course of his investigation into the homicide, Agent Heimbach spoke to witnesses, reviewed phone records, and reviewed allegations made by defense attorneys in New Orleans regarding the staged car accident scheme. [98]  Agent Heimbach testified that he never met Garrison, [99] but that federal agents first contacted Garrison in October 2019 when he was arrested for reasons unrelated to the staged collisions. [100]  Agent Heimbach testified that Garrison provided information about staged accidents and subsequently became a cooperating or confidential human source ("CHS") for the FBI, providing historical information and proactive cooperation.[101]

Garrison told federal agents that he staged accidents for Alfortish and Motta, that Alfortish paid him with checks issued by construction companies owned by Alfortish, and that Alfortish told him that if anyone asked about the payments he

---

[96] R. Doc. 529 at pp. 40–41.
[97] *Id*. at pp. 41–42.
[98] *Id*. at p. 50.
[99] *Id*. at p. 86.
[100] *Id*. at pp. 71–72.
[101] *Id*. at p. 72.  *See* Govt. Exhs. 1–31.

should say that they were for "construction" work.[102]  Both Garrison and his family

members told federal agents that Garrison had never performed construction work.[103]

Garrison told agents that the checks were issued after each staged accident. [104]

Garrison also told agents that on several occasions, Motta paid him on behalf of

Alfortish for the staged accidents.[105]  Agent Heimbach testified that The J.A. Trust,

which owns Affiliated Management (Alfortish's company) paid Garrison $119,000.00

in 2017 for "professional fees," that the checks are signed by Alfortish, and that

Garrison testified in a 2018 deposition that he had not worked in three years.[106]

Agent Heimbach further testified that he found evidence of Alfortish potentially

concealing assets in February 2020, through his mother's attempts to open a bank

account in the name of The J.A. Trust using fraudulent documents.[107]

On December 9, 2019, Garrison told federal agents that he met with Alfortish,

during which Alfortish said that he wanted Garrison to meet with four attorneys to

discuss payment for Garrison to not talk to law enforcement about the staged accident

scheme.[108]  Garrison also told agents that he recorded a meeting with Alfortish during

which Alfortish mentions "the construction stuff" and construction work that

Garrison did in 2017 on "Vanessa's house, my momma's house."[109]  Agent Heimbach

testified that, based on his review of the evidence, "construction" in this context is the

---

[102] R. Doc. 529 at pp. 74–77, 78, 82–83, &133; Govt. Exhs. 1, 2, 3, 6.
[103] R. Doc. 529 at pp. 82 & 94.
[104] R. Doc. 529 at p. 94; Govt. Exh. 9.
[105] R. Doc. 529 at pp. 75–77; Govt Exh. 2.
[106] R. Doc. 529 at pp. 108–112; Govt. Exhs. 45 & 46.
[107] R. Doc. 529 at pp. 119–125; R. Doc. 530 at p. 107; Govt. Exhs. 55–57.
[108] R. Doc. 529 at p. 83; Govt. Exh. 7.
[109] Govt Exh. 38 at timestamp 1:25 to 6:50.  See *Id.* at timestamp 4:10 to 4:46.

cover story for payments from Alfortish to Garrison for staged accidents.[110]  Agent Heimbach also testified that federal agents obtained a search warrant for Alfortish's Google account, and the records Google provided for the email address seanalfortish@gmail.com show that Alfortish searched, "How far back can government go to take your money if guilty of federal offense," and, "How far back can government go to obtain personal emails in a criminal investigation?" shortly after his recorded meeting with Garrison.[111]

On January 9, 2020, Garrison told federal agents that Alfortish had "again" offered to pay him $500,000.00 if he "took the fall for the staged accidents."[112] Garrison also told agents that Alfortish and Motta had recently traveled to the Bahamas and when they returned, Alfortish offered to move Garrison to the Bahamas "because of the heat from the investigation into the staged accidents," but that Garrison had declined the offer.[113]  According to Agent Heimbach, federal agents confirmed that Motta and Alfortish took a trip to the Bahamas between December 28, 2019 and January 3, 2020.[114]  Agent Heimbach testified that the FBI spoke to Demetra Henderson Burkhalter, a friend of Garrison's, who said that on or about September 17, 2020, she overheard Garrison say that he was still owed money from Motta and Alfortish and that they were attempting to get him to leave town, but that he was not going to do so until he got paid.[115]

---

[110] R. Doc. 529 at pp. 83–86; Govt. Exh. 38.
[111] R. Doc. 529 at pp. 87–90; Govt. Exhs. 40(a) & 40(b).  *See* Govt. Exh. 40(b) at pp. 91, 93, & 95.
[112] R. Doc. 529 at p. 96; Govt. Exh. 11 at p. 1.
[113] R. Doc. 529 at pp. 96–97; Govt. Exh. 11 at p. 1.
[114] R. Doc. 529 at p. 97.
[115] R. Doc. 529 at pp. 142–143.

Agent Heimbach testified that when he interviewed Harris, Harris told him that Alfortish and Parker were concerned about Garrison's cooperation in the federal criminal investigation and that Alfortish and Parker believed that Garrison needed to be gone or killed.[116]  Harris told Agent Heimbach that Alfortish asked if Harris knew anyone that could kill Garrison and that Harris arranged a meeting between Parker and Alfortish at his automobile repair shop in Metairie for that purpose.[117]  Harris also told Agent Heimbach that during the weekend after Garrison was indicted, there was a meeting at Motta Law between himself, Alfortish, and Motta, during which Alfortish and Motta expressed concern about Garrison and Alfortish mentioned that Garrison needed to be gone and started discussing the plot to murder Garrison.[118]  Harris told Agent Heimbach that Motta was present for that discussion and voiced no objection.[119]  During cross-examination, Agent Heimbach confirmed that Harris told him in February 2025 that he met with Alfortish and Motta at Motta Law before Garrison was murdered, that Alfortish and Motta discussed getting rid of Garrison, and that Alfortish and Motta asked Harris if he knew someone who could get rid of Garrison.[120]  Agent Heimbach also testified that Harris hold him that he bought burner phones to facilitate Garrison's murder, that Parker murdered Garrison, and that Parker told Harris that he drove to Kenner and Metairie the night

---

[116] R. Doc. 529 at pp. 143–145; Govt. Exh. 64 at p. 5; Govt. Exh. 65 at pp. 1–2; Govt. Exh. 67 at pp. 1 & 3.
[117] R. Doc. 529 at p. 145; Govt. Exh. 64 at p. 5; Govt. Exh. 65 at p. 1; Govt. Exh. 66 at p. 4; Govt. Exh. 67 at p. 1.  *See also* Govt. Exh. 67 at p. 3 ("ALFORTISH and MOTTA asked if he knew someone to get rid of GARRISON.").
[118] R. Doc. 529 at p. 146; Govt. Exh. 67 at p. 3; Govt. Exh. 68 at p. 5.
[119] R. Doc. 529 at pp. 146 & 199; Govt. Exh. 67 at p. 3; Govt. Exh. 68 at p. 5.
[120] R. Doc. 529 at pp. 197–199; Govt. Exh. 67 at p. 3.

of Garrison's murder to receive money from Alfortish for the murder.[121]  Harris told Agent Heimbach that he met with Parker after the murder and Parker asked him to drive "around the block" so that Parker could dispose of the murder weapon in a canal.[122]  Agent Heimbach testified that federal agents were never able to recover the weapon from the canal.[123]

During cross-examination, Agent Heimbach agreed that Harris gave two different statements regarding Motta's involvement in the alleged plot to kill Garrison, and testified that there were no cell site records placing Harris, Alfortish, and Motta at Motta Law between September 18, 2022 and September 22, 2022.[124] Agent Heimbach also testified that he has no evidence to corroborate that Alfortish purchased a burner phone in connection with Garrison's murder, that Alfortish and Parker met at Harris' automobile repair shop before the murder, or that Alfortish and Parker met behind a Home Depot after the murder.[125]  However, Agent Heimbach testified that Parker's device had activity in the radius behind the Home Depot in Metairie after the murder, and that the Home Depot was closed at the time.[126]

As to Parker's alleged involvement in Garrison's murder, Agent Heimbach testified that Regions Bank account statements introduced into evidence by the Government showed that Parker withdrew $39,000.00 from a savings account on September 21, 2020, the day before the murder, leaving a balance of $1,000.59, and

---

[121] R. Doc. 529 at pp. 146–148; Govt. Exh. 64 at p. 5; Govt. Exh. 65 at p. 2; Govt. Exh. 66 at pp. 4 & 5; Govt. Exh. 67 at p. 2.
[122] R. Doc. 529 at p. 147; R. Doc. 530 at pp. 98–99; Govt. Exh. 67 at p. 2.
[123] R. Doc. 529 at pp. 147–148; R. Doc. 530 at pp. 98–100.
[124] R. Doc. 529 at pp. 199–200.
[125] R. Doc. 530 at pp. 40–46 & 73–75; Govt. Exh. 59.
[126] R. Doc. 530 at p. 110.

that he withdrew $8,287.00 from his checking account, leaving a balance of $1,395.71.[127]  Agent Heimbach further testified that cell site records from phone numbers associated with Alfortish and Harris show that their devices were located about 0.1 miles away from each other near Networth Motors, Harris' automobile repair shop in Metairie, at around 12:30 p.m. on the day before the murder.[128]  Cell site records and text messages show that Harris met Parker about an hour later near a Planet Fitness in New Orleans East,[129] which Harris confirmed.[130]  Agent Heimbach testified that Harris purchased a burner phone from a Family Dollar store later that same day, exchanged text messages with Parker, and met up with Parker that night at the same Planet Fitness.[131]  Agent Heimbach also testified that on September 22, 2020, text messages were exchanged between Garrison and the burner phone purchased by Harris, which was used by Gardner.[132]  Gardner told federal agents that she texted Garrison as instructed by Parker and Harris, and that she saw Harris and Parker together in New Orleans East after Garrison's murder.[133]

While the defense questioned Harris' credibility during the hearing and Agent Heimbach confirmed that Harris gave different accounts of the murder,[134] their

---

[127] R. Doc. 529 at pp. 148–150.  *See* Govt. Exh. 69; Govt. Exh. 70 at p. 16; Govt. Exh. 71 at p. 2; Govt. Exh. 72.

[128] R. Doc. 529 at pp. 150–154.  *See* Govt. Exh. 73; Govt. Exh. 74; Govt. Exh. 75 at p. 3; Govt. Exh. 76; Govt. Exh. 77; Govt. Exh. 59 at p. 3.

[129] R. Doc. 529 at pp. 154–155; R. Doc. 530 at p. 113.  *See* Govt. Exh. 59 at p. 6.

[130] R. Doc. 529 at pp. 154–155.  *See* Govt. Exh. 65 at p. 2; Govt. Exh. 66 at p. 4.

[131] R. Doc. 529 at pp. 155–156; R. Doc. 530 at pp. 113–114.  *See* Govt. Exh. 59 at pp. 7–8.

[132] R. Doc. 529 at pp. 156–158; Govt. Exh. 59 at p. 10.

[133] R. Doc. 529 at pp. 155–162.  *See* Govt. Exh. 59 at pp. 9–10; Govt. Exh. 78; Govt. Exh. 79; Govt. Exh. 80.

[134] According to Agent Heimbach, Harris told Gardner and Travis Broadwater that he killed Garrison, Harris then told federal agents that he had no involvement in the murder, and Harris stated in his Factual Basis that he facilitated the murder in a scheme with Alfortish and Parker.  R. Doc. 530 at pp.

efforts were insufficient to undermine Agent Heimbach's testimony that his investigation connected Alfortish and Parker to Garrison's murder. Agent Heimbach indicated several times during the hearing that he did not believe that Harris was lying to federal agents, explaining that, "as we interview Ryan Harris, we get more and more information. I can't speak to how his memory works."[135] Agent Heimbach further testified that, "Ryan Harris has pleaded guilty to his role in the homicide. We obviously think Mr. Alfortish is involved as well."[136] Agent Heimbach also testified that he believes Parker went alone to Garrison's home on the night that he was murdered.[137]

### 2. The Motta Defendants

During the evidentiary hearing, the Government presented evidence showing that Motta was confronted with information indicating that some of the collisions for which she pursued lawsuits were staged.[138] The Government introduced text messages exchanged between Motta and attorney Jason Baer between November 2018 and April 2019, advising Motta that defense attorneys believed certain collisions were staged.[139] The Government also introduced recorded meetings and phone calls between Motta with two individuals regarding staged collisions and an affidavit from a third individual who recanted accusing one of the other individuals of being

---

63–65. Agent Heimbach further testified that, "[t]here's been variations, but largely the story has been the same." R. Doc. 530 at p. 63.
[135] R. Doc. 530 at pp. 95–96 & 101.
[136] Id. at p. 96.
[137] Id.
[138] R. Doc. 529 at pp. 42–71.
[139] R. Doc. 529 at pp. 42–55 & 67–71; Govt. Exh. 88.

involved in staged collisions.[140]  The Government also presented several video recordings of a meeting between Garrison, Motta, Bradley Egenberg, and one of Egenberg's associates that took place at Egenberg's office in January 2020, during which Egenberg agreed to represent Garrison in connection with a deposition subpoena he had received.[141]  While the Motta Defendants have argued that Motta set up this meeting to ensure Garrison had representation for a deposition for which he was subpoenaed, Egenberg testified during cross-examination that he did not perceive Motta as wanting to facilitate Garrison's testimony, and that they discussed quashing the subpoena.[142]  One of the video recordings played by the Government shows an interaction between Motta and Garrison while in an elevator on their way to Egenberg's office, during which Motta tells Garrison that Egenberg knows about "the construction."[143]  Agent Heimbach testified that this was a reference to the cover story used for the payments for staged accidents.[144]

Garrison gave varying accounts to federal agents regarding whether Motta knew that the collisions were staged.  In October 2019, Garrison told agents that Motta did not know that the collisions were staged, but he told agents in November 2019 that Motta may not have known that they were staged, but that she probably knew "as of this interview."[145]  On December 20, 2019, Garrison told agents that

---

[140] The three individuals are Tiffany Turner, Charlette Jones, and Marlene Kennedy.  *See* R. Doc. 529 at pp. 55–67; Govt. Exhs. 32, 33, 34, 35, 36, & 37.

[141] R. Doc. 529 at pp. 103–108; Govt. Exhs. 18, 44A, 44B, & 44C.

[142] R. Doc. 530 at p. 129.

[143] Govt. Exh. 44C.

[144] R. Doc. 529 at pp. 107–108.

[145] R. Doc. 529 at pp. 73–76 & 183–186; Govt. Exh. 1 at pp. 1–2.

Motta knew the collisions were staged from the start,[146] and he told agents on January 24, 2020 that Motta knew the collisions were staged because there were so many. [147] When asked about the apparent contradiction between Garrison's statements, Agent Heimbach testified that Garrison told agents that he was initially trying to protect Motta due to her sick child.[148] When pressed on this issue, Agent Heimbach stated that the agent who dealt directly with Garrison told him that Garrison said he felt bad for Motta.[149] Agent Heimbach further testified that Harris told him that Motta knew the collisions were staged, and further stated that Motta called him via Facetime after Garrison was indicted and told him to contact her using Facetime because the call would not appear on their phone records.[150]

The Government asserts in its Motion that Motta's persistent efforts to prevent Garrison from talking to anyone about the staged collision scheme demonstrates her intent to make Garrison an unavailable witness.[151] The Government further asserts that, "[a]t a minimum, Motta's history of obstructive behavior with Garrison and her close relationship to Alfortish establish that she acquiesced to Garrison's being made unavailable."[152] Counsel for the Motta Defendants argued during the December 12,

---

[146] R. Doc. 529 at pp. 95–96; Govt. Exh. 10 at p. 2.

[147] R. Doc. 529 at pp. 101–102; Govt. Exh. 16 at p. 2.

[148] R. Doc. 529 at pp.75 & 183–184.

[149] *Id*. at p. 184.

[150] R. Doc. 529 at pp. 143 & 145–146; Govt. Exh. 64 at p. 3; Govt. Exh. 67 at p. 3; Govt. Exh. 68 at pp. 3 & 5. *See* Govt. Exh. 66 at p. 3 ("MOTTA and ALFORTISH had to know the crashes were staged because HARRIS would let them know he would be back with another case before the crash even happened."); Govt. Exh. 67 at p. 1 ("the day CORNELIUS GARRISON (GARRISON) was indicted, VANESSA MOTTA (MOTTA) video called RYAN."); Govt. Exh. 68 at p. 4 ("After GARRISON was indicted, MOTTA FaceTime [sic] HARRIS to discuss GARRISON's cooperation with the government.").

[151] R. Doc. 227-1 at p. 21.

[152] *Id*. at p. 22 (citing *United States v. Hankton*, Crim. A. No. 12-01, 2016 WL 10950447, at *3 (E.D. La. June 2, 2016)).

2025 hearing that the issue before the Court is whether Motta "acquiesced in wrongfully causing" Garrison's unavailability as a witness and did so intending that result.[153] Counsel for the Motta Defendants maintains that there is no evidence that Motta acquiesced in causing Garrison's unavailability to prevent him from testifying at trial.[154] In response, the Government asserted that, "at a minimum [Motta] knew that he was going to be killed and did nothing."[155] When pressed by the Court, the Government asserted that, "knowledge that a person is going to be murdered and that the murder is related to making that person unavailable, that to me is the definition of acquiescence."[156]

To support its position, the Government relies on the statements Harris made to FBI agents and the statements in his Factual Basis about a meeting that purportedly took place at Motta Law during the weekend after Garrison's indictment.[157] On February 21, 2025, Harris told FBI agents (including Agent Heimbach) that he met with Alfortish and Motta a few times before Garrison's murder, during which Alfortish and Motta discussed "getting rid of GARRISON."[158] Harris also told agents that he met with Alfortish and Motta at Motta Law a day or two after Garrison was indicted, during which they both asked if Harris knew someone who could get rid of Garrison.[159] A few months later, on June 2, 2025, Harris told agents that he met with Alfortish and Motta at Motta Law approximately four

---

[153] Fed. R. Evid. 804(b)(6); R. Doc. 530 at pp. 204–205.
[154] R. Doc. 530 at pp. 204–209 & 211–218.
[155] R. Doc. 530 at pp. 246–247.
[156] *Id*. at p. 247.
[157] *See* R. Doc. 184 & Govt. Exhs. 67 & 68.
[158] Govt. Exh. 67 at p. 3.
[159] *Id*.

days before Garrison's murder, during which <u>Alfortish</u> stated that he wanted Garrison gone and that Motta "was present for that statement but did not disagree to SEAN's statement."[160]

Agent Heimbach testified about his interviews with Harris, and confirmed that Harris told him about the purported meeting between Harris, Alfortish, and Motta at Motta Law during the weekend after Garrison was indicted.[161]  According to Agent Heimbach, Harris told him that Alfortish and Motta expressed concern about Garrison during that meeting, Alfortish mentioned that Garrison needed to be gone, and Alfortish started discussing a plot to murder Garrison.[162]  Agent Heimbach testified that Harris told him that Motta was present for that discussion and did not object.[163]  Further, in his Factual Basis, Harris states that, "Alfortish, Motta, and Parker commented to **HARRIS** that Garrison was a 'rat' and a 'snitch' and that it would be better if Garrison were dead.  Alfortish asked **HARRIS** if he knew anyone who could assist Alfortish in killing Garrison"[164]

During the evidentiary hearing, the Court questioned the Government regarding its position on Motta's purported acquiescence in the plot to make Garrison unavailable for trial.  The Government argued that Motta's knowledge of the plot is sufficient for acquiescence.[165]  While the Government acknowledged that Motta was "inactive" after the purported meeting, it claimed that Motta's conduct after

---

[160] Govt. Exh. 68 at p. 5.
[161] R. Doc. 529 at pp. 143–146.
[162] *Id*. at p. 146.
[163] *Id*.
[164] R. Doc. 184 at p. 4.
[165] R. Doc. 530 at pp. 245–247.

Garrison's murder, including her FaceTime call with Harris, corroborates that she acquiesced to the murder.[166]

### 3. *The Court's Findings*

Now codified in Federal Rule of Evidence 804(b)(6), the forfeiture by wrongdoing exception to the hearsay rule allows for the admission of statements "offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result."[167] According to the Fifth Circuit, the party invoking the forfeiture by wrongdoing exception "carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable."[168]  In *Giles v. California*, the Supreme Court stated that the manner in which the forfeiture by wrongdoing exception was previously applied "makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying."[169]  During the December 12, 2025 hearing, the Court pointed out that the Supreme Court in *Giles* indicated that knowledge is not sufficient to prove the intent to make a witness unavailable.[170]  The Supreme Court in *Giles* recognized that the forfeiture by wrongdoing exception only applies when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did,

---

[166] R. Doc. 530 at p. 246.
[167] Fed. R. Evid. 804(b)(6).  *See Davis*, 547 U.S. at 833, 126 S.Ct. 2266 (acknowledging that Fed. R. Evid. 804(b)(6) codifies the forfeiture by wrongdoing doctrine).
[168] *United States v. Hankton*, 51 F.4th 578, 598–99 (5th Cir. 2022) (citing *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), *cert. denied* 143 S.Ct. 839, 215 L.Ed.2d 82 (2023)).
[169] *Giles*, 554 U.S. 353, 361,128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (emphasis in original).
[170] Transcript from the December 12, 2025 hearing at pp. 249–250 (citing *Giles*, 554 U.S. 353, 367,128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (emphasis in original)).

procure the unavailability of the declarant as a witness."[171]   The Supreme Court explained that, "[e]very commentator we are aware of has concluded the requirement of intent 'means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable," and that, "[t]he commentators come out this way because the dissent's claim that knowledge is sufficient to show intent is emphatically *not* the modern view."[172]

Before addressing the admissibility of the statements made by Garrison against any of the defendants in this case, the Court addresses the defendants' arguments regarding Harris' credibility.   Following the two days of evidentiary hearings, the Court allowed oral argument.   The Government argued that it presented corroborative evidence that supported Harris and Garrison's statements, while the defendants' arguments focused on Harris' credibility.[173]   The Government conceded that Harris previously made significant inconsistent statements.   The Court recognizes those inconsistencies.   When pressed by the Court specifically regarding "how do you address the attacks that [defendants] have seemingly raised on the credibility of Mr. Harris?" the Government first pointed out that Harris has been consistent in saying that Motta spoke poorly of Garrison and that she wanted him dead, including having a meeting and making such statements at Motta Law.[174]   The Government further relied on "other evidence that we believe meaningfully

---

[171] *Giles*, 554 U.S. at 367,128 S.Ct. 2678.
[172] Transcript from the December 12, 2025 hearing at pp. 249–250 (citing *Giles*, 554 U.S. 353, 367,128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (emphasis in original)).
[173] R. Doc. 530 at pp. 198–265.
[174] *Id*. at pp. 201–202.

corroborates" Harris' statements.[175] Specifically, the Government contended that Alfortish's Google searches, Alfortish's misconduct with his bank account, including seemingly concealing assets and providing false documents, Motta's conduct with Marlene Kennedy, Charlette Jones, the meeting at Egenberg's office, and the statements that Alfortish and Motta offered to pay Garrison to move him to the Bahamas.[176] Regarding Parker, the Government relied on the financial records, cell phone data records, and text messages to corroborate Harris' statements.[177]

Harris' credibility will be an issue at this trial. Nobody disputes that. This evidentiary hearing is not the trial. Further, and importantly, the purpose of this evidentiary hearing is for the Court to make a determination regarding the admissibility of Garrison's statements, not Harris' statements. The applicable rules of evidence differ and, most importantly, the standard of proof differs. With that said, the burden of proof remains on the Government at both the hearing and the trial. The difference is that the standard of proof for purposes of the instant Motion is preponderance of the evidence and the standard of proof at trial, of course, is beyond a reasonable doubt. The defendants raise significant issues as to Harris' credibility. The Motta Defendants subpoenaed Harris to testify at the hearing, but eventually withdrew that subpoena even after the Court declined to quash it. Thus, Harris did not testify at the hearing. What the Court is left with is the testimony of Agent Heimbach.

---

[175] *Id*. at pp. 202–203.
[176] *Id*.
[177] *Id*. at pp. 203–204.

The Court found Agent Heimbach very credible.  The Court further finds that the evidence presented during the evidentiary hearing, including the testimony of Agent Heimbach, establish by a preponderance of the evidence that Alfortish and Parker were involved in, or responsible for, procuring Garrison's unavailability as an actual or potential witness and that they did so intending that result.  There is sufficient evidence, at this time, to establish by a preponderance that Alfortish paid Parker to kill Garrison, which was arranged by Harris and Parker with Gardner's assistance, and that Alfortish, Parker, and Harris knew that Garrison was a potential witness in the federal criminal investigation of the staged collision scheme.  Thus, the Government has shown by a preponderance of the evidence that Alfortish and Parker wrongfully caused Garrison's unavailability as a witness in this matter and did so intending that result.  As such, the Court finds that all of Garrison's statements are admissible against Alfortish and Parker, subject to any objections to admissibility, such as those under Fed. R. Evid. 403 and 608, which will be handled through contemporaneous objections and rulings at trial.

During the hearing, the Court asked the Government, "[t]he government's position is that [Motta] acquiesced in [making Garrison unavailable]; is that right?" and the Government responded, "I think that the specific language that we have used in the pleadings is that at a minimum she knew that he was going to be killed and did nothing."[178]  The Government then argued, "I would say that knowledge that a person is going to be murdered and that the murder is related to making that person

---

[178] *Id*. at pp. 246–247.

unavailable, that to me is the definition of acquiescence."[179]  The Court turns to the hearsay exception set forth in Federal Rule of Evidence 804(b)(6).  The plain language of that rule makes clear that the exception applies to anyone who caused – or acquiesced in – making someone unavailable and intended that result.[180]  Thus, the exception applies not only to someone who caused a person to be unavailable, but also to an individual who acquiesced in making someone unavailable and intended that result.

The Motta Defendants fit that definition.  The Government has provided sufficient evidence that Harris made statements regarding a meeting that took place at Motta Law with Vanessa Motta and Sean Alfortish present, during which Alfortish and Motta discussed getting rid of Garrison.[181]  Harris claimed that they both asked if Harris knew someone who could get rid of Garrison.[182]  And while much of the hearing focused on Harris' statements, there was also evidence from Garrison regarding Motta, namely that Motta was aware of the staged accidents and that both Alfortish and Motta paid him for the staged accidents using funds that they said were for construction work.[183]  Further, there is a recorded conversation where Motta tells Garrison that an attorney knows about the "construction," which appears to corroborate payments made by Motta and Alfortish under the guise of construction.[184]  Thus, Motta would have a reason to not want Garrison available.  This evidence, in

---

[179] *Id*. at p. 247.
[180] *See* Fed. R. Evid. 804(b)(6).
[181] *See* Govt. Exh. 65 at p. 1 & Govt. Exh. 67 at p. 3.
[182] Govt. Exh. 67 at p. 3.
[183] *See* Govt. Exhs. 1, 2, 3, 6, 10, & 16; R. Doc. 529 at pp. 75–77.
[184] Govt. Exh. 44C.

addition to the other evidence introduced during the hearing, supports by preponderance that the Motta Defendants acquiesced in causing Garrison to be unavailable and did so intending that result. As such, the Court finds that all of Garrison's statements are admissible against the Motta Defendants, subject to any objections to admissibility, such as those under Fed. R. Evid. 403 and 608, which will be handled through contemporaneous objections and rulings at trial.

Fully recognizing the different standards of proof, the Court determines that the Government, through the agent's testimony and the corroborative evidence introduced, has carried its burden by a preponderance. How the jury ultimately weighs the testimony of Harris – or any witness – is appropriately left to the jury as fact finder. The Court's finding is strictly for purposes of this hearing.

## C. Appropriate limiting instructions as to Morgan and Stalbert.

To the extent that the Government asserts that certain statements made by Garrison to law enforcement that implicate Stalbert and Morgan in the staged collision scheme should be admissible against Parker, Alfortish, Motta, and Motta Law but not Stalbert and Morgan,[185] the Court finds that a limiting instruction to the jury is necessary and appropriate in this case. According to the Government, the statements at issue concern Garrison's participation in a staged collision in which Stalbert was a passenger and Garrison's participation in a collision involving Harris's "blind brother," because Harris's blind uncle was a passenger in a staged collision

---

[185] R. Doc. 227-1 at pp. 24–25. Specifically, the Government references statements by Garrison that concern his involvement in a staged collision in which Stalbert was a passenger and statements regarding Garrison's involvement in a collision involving Harris's "blind brother." *Id.* at p. 24 (*citing* R. Doc. 78 at p. 15; R. Doc. 227-7 at p. 2).

involving Morgan.[186]  The Fifth Circuit "has repeatedly stated that an appropriate limiting instruction is sufficient to prevent the threat of prejudice of evidence which is incriminating against one co-defendant but not another."[187]  Like the Fifth Circuit in *United States v. Rocha*, the Court finds that the evidence at issue here is "not so complicated as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered."[188]  The Court further finds that Morgan and Stalbert will suffer no more prejudice "than that which necessarily inheres whenever multiple defendants or multiple charges are jointly tried."[189]  The Court therefore has "no reason to believe that the jury would be unable to separate the evidence as it was relevant to each defendant."[190]  To the extent Morgan asserts that the statements in Garrison's 302 Reports and 1023 Reports that purportedly implicate him should be excluded from evidence at trial because they are unreliable, they will be cumulative of other evidence at trial, their probative value is substantially outweighed by the risk of unfair prejudice under Fed. R. Evid. 403, and they constitute hearsay within hearsay under Fed. R. Evid. 805,[191] these objections are overruled at this time.  Such objections can and will be handled through contemporaneous objections and rulings at trial.

---

[186] R. Doc. 227-1 at p. 24 (*citing* R. Doc. 78 at p. 15).
[187] *United States v. Rocha*, 916 F.2d 219, 228–29 (5th Cir. 1990) (citation modified).
[188] *Id*. at 229.
[189] *Id*. (quoting *United States v. Tashjian*, 660 F.2d 829, 834 (1st Cir. 1981)) (citation modified).
[190] *Rocha*, 916 F.2d at 229.
[191] R. Doc. 292 at pp. 4–5.

### D. Supplemental briefing

Finally, to the extent that Parker requests that the Court allow for supplemental briefing on the forfeiture by wrongdoing issue "after all relevant evidence is adduced at the evidentiary hearing,"[192] that request is denied. Each defendant was given the opportunity to brief the issue prior to the hearing and to present evidence and question witnesses during the hearing regarding the statements sought to be introduced under the forfeiture by wrongdoing exception. Under these circumstances, the Court finds that supplemental briefing is not warranted.

### IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Government's Motion to Admit Statements Under the Forfeiture by Wrongdoing Exception[193] is **GRANTED in part and DEFERRED in part**. The Motion is **GRANTED** to the extent that the Government seeks to admit statements made by Cornelius Garrison to law enforcement and others against Sean Alfortish, Leon Parker, Vanessa Motta, and Motta Law, LLC under the forfeiture by wrongdoing exception set forth in Fed. R. Evid. 804(b)(6). To the extent Garrison's statements indirectly implicate Carl Morgan or Diaminike Stalbert in participating in staged collisions, the Court finds that a limiting instruction to the jury is necessary and appropriate in this case. All of Garrison's statements on any topic can be introduced at trial, with the caveat that any other objections to admissibility, such as those under Federal Rules of Evidence

---

[192] R. Doc. 340 at p. 12.
[193] R. Doc. 227.

403 and 608, can and will be handled through contemporaneous objections and rulings at trial. The Motion is **DEFERRED** to the extent that the Government seeks to introduce coconspirator statements allegedly made by Cornelius Garrison to Ryan Harris against Jason Giles and the King Firm, LLC under Fed. R. Evid. 801(d)(2)(E).

New Orleans, Louisiana, February 20, 2026.

**WENDY B. VITTER**
**United States District Judge**